271 N.J. Super. 1 (1994)
637 A.2d 1270
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
VINCENT JAMES LANDANO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1994.
Decided February 25, 1994.
*3 Before Judges BAIME, CONLEY and VILLANUEVA.
Neil Mullin argued the cause for appellant (Smith, Mullin & Kiernan, attorneys; Mr. Mullin, of counsel and on the brief).
Donald L. Gardner, Assistant Prosecutor, argued the cause for respondent (Carmen Messano, Hudson County Prosecutor, attorney; *4 Mr. Gardner and Jeffrey S. Ziegelheim, Assistant Prosecutor, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
On August 13, 1976, two gunmen robbed the Hi-Way Check Cashing Service in Kearny, New Jersey. One of the robbers shot and killed a Newark police officer, John Snow. Defendant Vincent James Landano and three other individuals were subsequently arrested. Tried alone, defendant was convicted of murder and other related offenses. Over the next sixteen years, defendant repeatedly challenged his convictions in both the State and Federal courts. In these proceedings, defendant contended that his convictions were tainted by prosecutorial misconduct. This appeal is from the latest denial of defendant's petition for post-conviction relief.
We find that the prosecutor violated defendant's constitutional rights by withholding exculpatory evidence. Although we will examine this evidence in greater detail later in our opinion, we briefly describe it here. First, the State suppressed evidence that its principal identification witness was under investigation for having ties with organized crime and was suspected of having engaged in loansharking and money laundering, and further, that on the very day his earlier tentative identification of defendant became positive, he was questioned about the possibility he had paid illegal gratuities to Officer Snow. Second, the State suppressed evidence that its chief witness, who pleaded non vult and testified against defendant, had been involved in a longstanding criminal venture with others and that they had committed numerous armed robberies similar to the Hi-Way Check Cashing Service robbery. Newly discovered evidence, including fingerprints and ballistics tests, disclosed that the witness and his closest associate had committed an earlier armed robbery in which the gun used to kill Officer Snow had been fired. Third, the State suppressed evidence that the only eyewitness to the shooting *5 rejected defendant's photograph because the perpetrator had "curlier" hair than Landano. And fourth, another witness who had possibly seen the suspects before the robbery and killing also rejected defendant's photograph because the individual she had met was "younger" than Landano.
We conclude that there is a reasonable probability the outcome of the trial would have been different had this evidence been disclosed to the defense. This constitutional violation undermines our confidence in the jury's verdict and warrants a reversal of defendant's convictions.

I.
At the outset, we note the tortuous path this case has taken. In order to understand the issues raised here, it is necessary to distinguish the evidence presented at trial from that developed in various post-conviction proceedings.

A. THE TRIAL

The Hudson County grand jury returned a multi-count indictment, charging defendant, Allen Roller, Victor Forni and Bruce Reen with felony murder, armed robbery, breaking and entering with intent to steal, receiving a stolen motor vehicle, possession of a firearm and conspiracy. David Lee Clyburn was named as an unindicted co-conspirator. The trial of Forni and Reen was severed from that of defendant and Roller.[1] Roller pleaded non vult to felony murder. He testified at defendant's trial, as did Clyburn. The State's theory was that Roller and Forni planned the robbery and the killing of John Snow, and recruited defendant for this purpose. The prosecutor contended that only defendant and Roller actually participated in the robbery, and that defendant fired the fatal shots.
*6 At trial, Clyburn testified that he, Roller and Forni had a long history of engaging in armed robberies. Roller generally supplied the weapons, while Forni usually served as the "get-away driver" and "back-up." Roller often recruited African-Americans to assist in these crimes. According to Clyburn, defendant and Forni had a very close relationship. Clyburn testified that they were very "tight" and each had a great deal of "respect" for the other.
Clyburn recounted that in July 1976 Roller and Forni conceived the plan of robbing "a check cashing place in [New] Jersey." Clyburn testified that Forni was the "chief coordinator" in this endeavor. They discussed the plan at a meeting early in the summer in Staten Island at the clubhouse of "the Breed," a motorcycle gang to which Roller and Bruce Reen belonged. Roller and Forni told Clyburn his role was to "take care" of a police officer who generally delivered large amounts of cash, and that an unnamed "white guy" would accompany him and "hit" a security guard located inside the check cashing trailer. Forni then drove Roller and Clyburn to Jacobus Avenue in South Kearny to view the site. According to Clyburn, they returned to the area the following week in order to make a "dry run" and to determine the police officer's schedule in delivering the money. The three men waited in the parking lot of a nearby tavern until the police car arrived. They observed the officer deliver the money and then departed. A third visit apparently occurred toward the end of July for the same purpose. Clyburn ultimately decided to withdraw from the scheme because he did not want to kill a police officer and feared that his confederates might "turn on" him because he was the only black involved.
Roller's version of the events preceding the robbery deviated from that of Clyburn in various particulars. He denied engaging in other robberies with Clyburn or Forni. Roller conceded that he had lent Clyburn a gun and had received a share of the proceeds, but claimed he did not directly participate in these robberies. Roller's testimony regarding the planning of the robbery of the Hi-Way Check Cashing Service also conflicted with *7 that of Clyburn. Roller denied telling Clyburn he would supply a "white guy" to assist him with the robbery. He also claimed that the three men visited the scene on only one occasion. According to Roller, he asked Forni if he would be interested in participating in the robbery. Roller testified that Forni wanted "no part in it," but offered to recruit a person named "Jimmy." According to Roller, two days before the robbery, he, Forni and Reen went to defendant's apartment in Staten Island to discuss the plan. Defendant allegedly agreed to participate. On the next day, Forni allegedly drove Roller and defendant to South Kearny to inspect the area of the proposed robbery.
Roller recounted that he met defendant at Forni's house at approximately 7:45 a.m. on the day of the robbery. Neither Roller nor defendant had an operable automobile. Roller thus requested Forni to drive them to Kearny. According to Roller, Forni became upset and reiterated that he would not participate in the robbery. Roller testified that despite his protestations, Forni ultimately agreed to drive him and defendant to New Jersey. En route, the three men stopped at a parking lot where Roller, using a "dent puller," stole a 1968 green Chevrolet. At Roller's request, Forni purchased containers of coffee for him and defendant. He then departed. Roller testified that he and defendant waited in the parking lot of the nearby tavern for the owner of the check cashing service to arrive.
Jacob Roth, the owner of the Hi-Way Check Cashing Service, had arrived earlier in the morning, having driven his son's automobile. Jacob's son, Jonathan, had taken his father's white Cadillac for servicing. Both Roller and defendant were unaware of this fact and continued to await the arrival of Roth's Cadillac, which Roller had seen in the course of one of his surveillances. Jonathan arrived in the Cadillac at approximately 9:20 a.m. and entered the trailer. Also present in the trailer was a customer, John De Maritz. Another customer, Colin McCormick, had just cashed a check and was seated in his van.
*8 Roller testified that upon seeing the Cadillac, he and defendant approached the trailer. Roller recounted that he told defendant to grab McCormick and place him underneath the van. According to McCormick, a tall thin man with broad shoulders and dark hair approached him with a gun and told him to lie on the floor of the van. As McCormick complied, he observed a bearded man with red hair, whom he later identified as Roller, holding a gun. McCormick testified that Roller went first to the check cashing window and then moved to the trailer door. At trial, McCormick claimed that defendant was the dark haired perpetrator. However, he admitted that he did not observe the man's face and that his pretrial photographic identification of defendant was based upon his recollection of the perpetrator's build. McCormick indicated that defendant's photograph was the "closest" of those shown to him, but he couldn't "say for sure." McCormick's in-court identification was barred following an Evid. R. 8 hearing (now N.J.R.E. 104(a) and (c)). The trial judge characterized McCormick's attempt to identify defendant as "unreliable."
Both Jacob and Jonathan Roth testified at trial. Viewing their testimony in its entirety, the chronology of events is somewhat murky. According to Jacob Roth, a man came to the trailer window, placed a gun on the ledge and ordered him to open the door. Jacob testified that there was a "bullet proof" glass partition with a small aperture used for check cashing transactions. The man was unable to place the gun "under the window." Jacob described the man as being five feet, ten inches tall, between 160 and 170 pounds, and having black hair and a "Fu Manchu" mustache. As soon as he observed the gun, Jacob pressed the silent burglar alarm and yelled "[h]it the deck." He then fell to the floor and "never looked up." Jacob testified that he heard the "shattering of glass," and someone standing over him, saying, "[n]obody look up and no one will get hurt." The man then "stepped over [him]," pulled the drawer out, took the money and left the trailer. Jacob recounted that he waited several seconds after the man left and then went to the glass door where he saw *9 two men run to an automobile. Jacob was able to record the license plate number which he later gave to the police.
At trial, Jacob testified that he identified defendant from a photographic array that had been shown to him toward the end of August 1976. Apparently, that identification was tentative. Jacob commented that the photograph of defendant "resembled" the perpetrator and that "it might be the person if he had a Fu Manchu mustache." The record indicates that Jacob did not sign the back of the photograph. In the photograph shown to Jacob, defendant had a slight mustache. Jacob later made a more positive identification of defendant from a photographic array.[2] On the latter occasion, defendant, as shown in the photograph, was clean-shaven. That photograph was signed by Jacob and dated. Jacob was positive at trial that defendant was the man who entered the trailer and stole the money. He was never aware of the red-bearded man.[3]
Jonathan Roth identified the defendant with an element of uncertainty. He testified that he observed defendant for "a second or two," running past the trailer door. According to Jonathan, defendant "banged" on the door, demanding that it be opened. Jonathan then noticed another man with red hair and a beard in front of the check cashing window. At this point, Jonathan heard his father call out and the sound of glass breaking. The red-bearded man entered the trailer and ordered the occupants to lie face down. A "split second" after the man left, Jonathan heard one or two shots fired.
*10 De Maritz gave an account similar to that of Jonathan. He observed a red-bearded man bursting into the trailer with a gun in his hand. The man was wearing a blue denim jacket. De Maritz testified that he immediately complied with the man's order to lie down. As the man was leaving, De Maritz heard shots coming from outside the trailer. Prior to trial, De Maritz selected Roller's photograph from an array.
Roller's account was that he gained entry into the trailer by breaking the door window with the butt of his gun. He then reached in, opened the door, entered and ordered everyone to lie down with their heads on the floor. Roller testified that while he was busy in the trailer, defendant was robbing McCormick. According to Roller's testimony, defendant was assigned the additional role of intercepting the police officer and stealing the cash that was to be delivered.
Joseph Pascuiti was the only person who actually witnessed the shooting of the police officer. Pascuiti worked at Modern Warehouse which was adjacent to the Hi-Way Check Cashing Service. From the vantage point of the loading bay, Pascuiti observed a man with dark hair "running from out of the little trailer" toward a blue and white police vehicle that had just arrived. Without warning, the man "raised his arm[] above his head and pointed a gun down" toward the driver of the patrol car. According to Pascuiti, the man was approximately "two to three feet" away from the driver. Pascuiti turned toward the office in order to contact the police when he heard "three or four shots." He then observed the dark-haired man drive away in a green Chevrolet. At trial, Pascuiti described the perpetrator as having dark, curly hair and broad shoulders. The witness testified that he did not notice a mustache, but that he only saw the profile of the man. On cross-examination, Pascuiti related that he selected Forni's photograph from an array shortly before trial. He noted that the man depicted in the photograph "resemble[d]" the perpetrator, particularly his "curly hair." However, on redirect examination, *11 Pascuiti admitted that he was "not certain of anyone," and had not selected a photograph.
Roller testified that he rejoined defendant outside the trailer and that the two men drove off in the stolen Chevrolet. According to Roller, he sat in the rear seat while defendant drove. Roller related that defendant exclaimed he had to "ice or waste the cop." Roller testified that defendant "missed the turn" and mistakenly drove down a dead end street toward the railroad tracks.
Raymond Portas, a truck driver, testified that while sitting at a blocked intersection, he saw a green Chevrolet maneuver out of traffic and then proceed along the nearby railroad tracks. According to Portas, the Chevrolet came "charging down" the street, "cut in on the railroad tracks," and then returned to the roadway. Portas's description of the vehicle's license plate number matched that recorded by Roth. Portas testified that the automobile came to a standstill and that he was able to observe the two occupants. A broad-shouldered man with long hair and a heavy brownish red beard was seated in the back. The driver appeared to be taller and younger and had a "five o'clock shadow." On the night of the robbery, Portas erroneously identified William Applegate as the rear seat passenger. Shortly before trial, Portas selected defendant's photograph from an array and identified Landano as the driver. In the photograph, defendant was "clean shaven." Portas testified that he did not "remember a mustache on the man driving the car." Portas recounted that after he selected defendant's photograph, one of the law enforcement officers said "[t]hat's him." At trial, Portas identified defendant as the one he "believe[d] to be the driver of the Chevrolet."
Roller confirmed the incident at the traffic block. He testified that they later came to a dead end street abutting the river, where they removed the money and discarded their weapons. Roller testified that they left defendant's blood splattered jacket, gloves and hat in the car. According to Roller, the two men abandoned *12 the automobile and parted, meeting later at Forni's house where they divided the money.
At approximately 10:30 that morning, Kearny police officers discovered the abandoned getaway car. A search of the car and the surrounding area revealed a bloodstained white jacket or vest, two pairs of brown gloves, and a blue hat. The police also discovered an attache case containing $60 in coins, a .38 caliber shell and a partially filled coffee container. The blood found on the jacket, a relatively rare type, matched that of the slain police officer. Two handguns were recovered from the river. Roller identified the .38 caliber weapon as belonging to him, and the Browning automatic pistol as the one that had been used by defendant. Ballistics tests revealed that a bullet removed from the police officer's body was fired from the automatic pistol and that the shell found in the stolen Chevrolet had come from the same weapon. The automatic pistol was traced to Forni.
At trial, the State introduced several photographs of defendant taken routinely at a Staten Island check cashing establishment. Two of the photographs, taken in July 1976, depicted defendant with a mustache, wearing a denim hat similar to the one found in the getaway car.[4] A third photograph, taken at 12:50 p.m. on August 13, 1976, showed defendant bareheaded. Strands of hair taken from the inside of the hat generally compared with that of defendant. However, the State Police chemist added that the test was not a "positive point of identification" and that the hairs could have come from another individual with the same general characteristics.[5] At trial, defendant tried on the blood stained jacket or *13 vest found in the Chevrolet. It was too small and did not fit him. Although there is testimony in the trial transcript indicating that the hat also did not fit the defendant, the record is not clear on this point.[6]
Defendant elected to testify. He denied participating in the crime, placing himself at various locations in Staten Island and Manhattan during the day in question. Corroborating testimony was given by defendant's fiancee and her friend. Defendant also introduced evidence indicating that he attended a methadone clinic in Staten Island at approximately 6 o'clock on the morning of the robbery. He contended that he could not have travelled to New Jersey in time to participate in the theft of the green Chevrolet which occurred at approximately 6:35 a.m.
The jury viewed this case as a close one. After two days of deliberations and an intervening weekend, the jury sent a message to the judge indicating that it was unable to reach a verdict. The judge gave a supplemental instruction similar to that approved by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) which emphasized the importance of reaching a unanimous verdict.[7] During its deliberations, the jury showed a special concern for the eyewitness testimony of Jacob Roth, Jonathan Roth and Joseph Pascuiti which it requested to have re-read. The jury also asked for clarification of the photographic arrays shown to Jacob Roth and requested copies of his identification statements.

*14 B. MOTION FOR NEW TRIAL

Following his conviction, defendant moved for a new trial. In support of his application, defendant presented newly discovered evidence linking Forni with an armed robbery of a tavern in Jersey City on December 12, 1975. Fingerprint evidence available in November of 1976 indicated that Roller was one of several participants. However, it was only in March of 1978 that a report identified a fingerprint found on the automobile used in the robbery as belonging to Forni. At the same time, a ballistics test conducted by the State Police indicated that an expended shell found at the scene of the robbery was fired by the Browning automatic used to kill Officer Snow. As we noted earlier, this weapon belonged to Forni.
We emphasize that there was no contention the prosecutor had concealed evidence disclosing Forni's participation in the Jersey City robbery. In contrast, defendant presented additional evidence indicating that the prosecutor failed to disclose information in his possession at the time of trial regarding the involvement of Roller, Forni and Reen in two robberies of a Perth Amboy coin shop. The armed robberies were committed on September 26, 1975 and January 23, 1976. The victim indicated that Roller, Forni and Reen were probably the perpetrators of the first robbery. An automobile registered under Roller's alias was used in the second robbery. Additional information identifying the perpetrators of the second robbery as those involved in the first one had also been conveyed to the Hudson County authorities, although not in detail. Information linking Roller, Forni, and Reen to the Perth Amboy robberies was known by a member of the Hudson County Prosecutor's Office who was in charge of the investigation of the Kearny robbery. The assistant prosecutor who tried the Landano case was aware of the fact that the Breed was involved in the Perth Amboy robberies, but did not know specifically that Roller, Forni and Reen were alleged to have participated.
*15 Defendant also presented evidence that Roller recanted his trial testimony. We need not describe this evidence in detail. Suffice it to say that the trial judge conducted an evidentiary hearing relating to this evidence and found it to be incredible. We note that Roller never recanted under oath, refused to testify at the evidentiary hearing and was cited for contempt.
In denying defendant's motion, the trial judge conceded that evidence pertaining to the Jersey City and Perth Amboy robberies was exculpatory because it tended to impeach Roller's trial testimony and confirm the defendant's argument that Roller was protecting Forni. The evidence also tended to show a series of crimes committed by Roller and Forni without the defendant. The judge nevertheless concluded that neither the newly discovered nor the suppressed evidence was so favorable as to affect the jury's verdict. The judge found that the result of the trial would have been the same had this evidence been presented.
We subsequently affirmed defendant's convictions and the denial of his motion for a new trial in an unreported opinion. The Supreme Court denied certification. State v. Landano, 85 N.J. 98, 425 A.2d 264 (1980).

C. DEFENDANT'S FIRST PETITION FOR POST-CONVICTION RELIEF

Defendant then filed a petition for post-conviction relief. Among other claims, defendant contended the State had withheld information concerning its investigation of allegations that Jacob Roth had connections to "underworld" figures, that he had engaged in "loan sharking" and "money laundering" activities and that he had paid illegal gratuities to Officer Snow. The principal thrust of defendant's claim was that the prosecutor had improperly "pressured" Roth to make a positive identification of the defendant as one of the robbers and had concealed that fact. Defendant claimed that the information suppressed by the State could have been used to show Roth was concerned about possible *16 criminal charges and losing his business license.[8] The defense could have asserted that Roth was seeking to curry favor with the prosecution and that his identification of Landano was either coerced, pressured or otherwise tainted.
On July 21, 1981, the assistant prosecutor who had presented the State's case four years earlier addressed an audience at Kean College on the topic of the Landano trial. His remarks revealed for the first time that during the pendency of the investigation of the Hi-Way Check Cashing Service robbery, a simultaneous inquiry was being conducted into Roth's business dealings. The assistant prosecutor apparently suspected that Roth was engaged in "loan sharking" and "money laundering." Particular suspicion had been aroused because Roth had sold a check cashing service in Elizabeth to a notorious Bayonne "loan shark," Anthony Gallagher. On September 22, 1976, Roth had posted a $10,000 collateral for Gallagher's use in connection with that establishment. The assistant prosecutor believed that Roth and Gallagher were affiliated in an illegal joint venture.
The assistant prosecutor's remarks indicated that Roth was aware of the ongoing investigation into his business dealings. He explained that Roth was subjected to "numerous interviews" throughout the investigation and that law enforcement officers had probed not only Roth's "underworld" connections but also possible improprieties in his relationship with John Snow. Roth was repeatedly questioned concerning whether he ever gave any money as a gratuity to Officer Snow. The assistant prosecutor noted that Roth "was a somewhat uncooperative guy" who "never want[ed] to be bothered" and that he had to "coerce him" to be "involved."
Judge Maurice Walsh, who had presided over defendant's trial, had retired and defendant's petition was considered by another *17 Law Division judge. The judge denied defendant's request for an evidentiary hearing and summarily dismissed the contention that the State had improperly pressured Roth and had concealed this fact. The judge found that Roth's connection to Gallagher was "speculative" and that questions relating to Roth's identification of defendant were "exhaustively raised on direct appeal."
In his petition, defendant presented an affidavit executed by Portas in which he recanted portions of his trial testimony. The Law Division judge granted defendant's request for an evidentiary hearing respecting that issue. It will be recalled that in his trial testimony, Portas said he had two opportunities to view photographs in an effort to identify the perpetrators of the crime. The first viewing took place on the night of August 13, 1976, when Portas erroneously identified William Applegate as the rear seat passenger. On April 15, 1977, ten days before trial, Portas identified defendant as the driver.
Portas's testimony at the post-conviction relief hearing differed from his trial testimony in two respects. Contrary to his prior testimony, Portas revealed that he was initially unable to identify defendant's photograph on April 15, 1977. Portas recalled that he was shown a series of photographs depicting dark-haired individuals and that he selected a picture of a person other than the defendant. According to Portas, the prosecutor immediately "picked up the picture [he selected] and handed it" to an investigator who left the room. Portas further testified that he never saw that photograph again.
Portas recounted that he continued to review the remaining photographs while engaging the prosecutor in casual conversation. According to Portas, he remarked to the prosecutor, while pointing to one of the photographs, that "if this man wasn't so fat, I would have picked him." Portas recalled that the prosecutor then exclaimed, "[t]hat's the man we want." This second photograph was that of the defendant. Portas claimed that he signed Landano's photograph because a detective had said "we think he is the one."
*18 Portas also asserted that his in-court identification of defendant was affected by an incident that occurred in the hallway outside the courtroom. Portas testified that he had not recognized defendant when Landano and another well-dressed man passed him in the hallway. Portas then entered the bathroom where he was approached by a person whom he assumed to be a detective. The detective said "that's our man." Shortly thereafter, Portas returned to the courtroom and identified defendant as the driver of the stolen Chevrolet. Portas testified that he believed he had been "influenced" in his identification. As a result of this uneasiness, Portas consulted with a priest who assured him that the prosecutor and the police "kn[ew] what they [were] doing." Portas's concerns were later revived when he read a magazine article analyzing defendant's trial and depicting the conviction as having been based upon a paucity of evidence. Portas went first to the prosecutor, who apparently was unresponsive, and then communicated with defendant's attorney.
The Law Division judge issued a written opinion on December 3, 1982 in which he found Portas's testimony to be "untrustworthy." Defendant's petition was denied on that basis. We affirmed the denial in an unreported opinion. On June 12, 1984, the Supreme Court denied certification. State v. Landano, 97 N.J. 620, 483 A.2d 153 (1984).

D. DEFENDANT'S FEDERAL HABEAS CORPUS PETITION

Defendant thereafter filed a petition for a writ of habeas corpus in the United States District Court in which he claimed:
(1) that his due process rights to a fair trial were infringed by the admission of Raymond Portas's identification testimony; (2) that the State unlawfully suppressed exculpatory and material evidence that would have impeached the testimony of codefendant Allen Roller; (3) that the State unlawfully suppressed exculpatory and material evidence that would have impeached the testimony of Jacob Roth, victim of the armed robbery; and (4) that the state court's coercive charge to the jury violated the petitioner's Sixth Amendment right to an impartial jury.
*19 The district court granted defendant's request for an evidentiary hearing regarding Portas's recantation. In a reported opinion, the district court found Portas to be a credible witness and noted that his recantation testimony was "believable." Landano v. Rafferty, 670 F. Supp. 570, 579 (D.N.J. 1987). However, the district court concluded that there was no deficiency in the Law Division's factual findings and that such findings were entitled to a "`high measure of deference.'" Id. at 581 (citing Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)). The district court thus concluded that defendant had not overcome the "presumption of correctness." Id. at 581-82 (citing 28 U.S.C. § 2254(d)).
The district court also considered defendant's claim that the State had improperly failed to disclose evidence relating to the involvement of Roller, Forni and Reen in the Perth Amboy armed robberies. While noting that presentation of this evidence would have impaired Roller's credibility and created "a powerful suggestion that [he] was lying to protect Forni[,]" the district court could not conclude that "there [was] a reasonable probability ... the outcome would have been different" had this material been disclosed. Id. at 586. In a similar vein, the district court observed that the State's investigation of Jacob Roth's business dealings constituted exculpatory evidence that could have been used to attack his credibility. Id. at 588. However, the district court concluded that there was no reasonable probability the outcome of the trial would have been different had such evidence been disclosed. Ibid. Finally, the district court found that the supplemental instructions given by the trial judge did not violate the federal constitution. Id. at 589-90.
The Third Circuit affirmed the district court's determination. Landano v. Rafferty, 856 F.2d 569 (3d Cir.1988). It agreed with the district court that the Law Division's factual findings regarding Portas's recantation were entitled to the "presumption of correctness" under 28 U.S.C. § 2254(d) and that Landano had not overcome that presumption. Id. at 572. The Third Circuit also *20 agreed that the State's suppression of evidence relating to the participation of Roller, Forni and Reen in the Perth Amboy robberies did not have the capacity to affect the jury's verdict. Id. at 573-74. The district court's findings and conclusions concerning the State's suppression of information relating to the Jacob Roth investigation were also sustained. Id. at 574. The United States Supreme Court denied certiorari. Landano v. Rafferty, 489 U.S. 1014, 109 S.Ct. 1127, 103 L.Ed.2d 189 (1989).

E. RECONSIDERATION OF DEFENDANT'S HABEAS CORPUS PETITION

On June 8, 1989, the district court granted defendant's ex parte application and entered a temporary restraining order directing the United States Marshal to seize files relating to the prosecution of Landano, Forni, Roller and Reen maintained by the New Jersey Attorney General, the Hudson County Prosecutor and several police departments. The district court thereafter granted defendant's request to reopen its prior judgment based upon newly discovered evidence. Defendant contended that exculpatory evidence was suppressed by the State and was only recently discovered from the confiscated files by his attorney.
Among the items alleged to have been suppressed was a Kearny Police Department continuation report prepared by Detective Edward Rose and dated January 19, 1977. The report contained the following entry:
I then stopped at the Modern Transporttation [sic] and spoke to Joseph Pasapas [sic] who requested to see more pictures. He was shown the 17 picture spred [sic] # 21529 to 21544 and he picked out # 21532 Victor Forni as resembling the man who drove the car away. [sic] from the scene of the holdup on 8/13/76.
One copy of this report was located in the Kearny Police Department's files, and two copies were found in the Hudson County Prosecutor's files. None of the files searched contained a photograph *21 of Forni signed by Basapas/Pasapas[9] and there was no identification statement signed by such an individual. One copy of the report was discovered in the files of Victor Forni's defense attorney. A letter to defendant's lawyer, who died after the trial, indicates that he received supplemental discovery on March 11, 1977 and that this included "[c]ontinuation reports from the Kearny Police Department." Although the assistant prosecutor who tried the Landano case had no specific recollection of the report, he noted that on a copy located in the prosecutor's files the word "Basapas/Pasapas" was apparently crossed out and replaced with the word "Pascuiti" in his handwriting. He surmised that he must have ascertained that the original entry of Basapas/Pasapas was a misspelling of Pascuiti and that he probably sent the report to defendant's attorney. However, an exhaustive and detailed discovery list, which identified each continuation report turned over to the defense, contained no reference to the Basapas/Pasapas report. Moreover, certifications filed by defendant's present attorney, who had long represented Landano and was familiar with the discovery provided by the prosecutor, indicated that the continuation report was not turned over to the defense.
Based upon this evidence, the district court concluded that the prosecutor had suppressed the Kearny Police Department continuation report. Landano v. Rafferty, 126 F.R.D. 627, 652-53 (D.N.J. 1989). The district court concluded that the report was material and probably would have affected the outcome of the trial had it been disclosed. Id. at 653-54. As we will note later in our opinion, the Third Circuit subsequently reversed the district court's judgment granting defendant a writ of habeas corpus because Landano had not exhausted his state remedies. Landano v. Rafferty, 897 F.2d 661 (3d Cir.1990). Moreover, following a later evidentiary hearing in the Law Division, Judge Walsh, who had been recalled, concluded that the reference to the identification of Forni in the continuation report merely described Pascuiti's *22 tentative selection of Forni's photograph and that the withheld evidence was not material. We thus need not describe in detail the district court's analysis of this question. Suffice it to say, the district court concluded that if the Basapas/Pasapas entry referred to an unknown witness who identified Forni as the person who shot Officer Snow, then such evidence would probably have affected the outcome of the Landano trial had it been disclosed to the defense. Landano v. Rafferty, 126 F.R.D. at 653. The district court concluded that the report was material even if it referred to Pascuiti's identification of Forni, because it could have been used to counter the prosecutor's redirect examination of the witness. Ibid.
Later in this opinion, we will describe in detail our reason for rejecting the district court's findings and conclusions regarding the Basapas/Pasapas report. Because we agree with Judge Walsh's subsequent finding that the entry relating to Basapas/Pasapas actually referred to Pascuiti and, in any event, had no effect on the outcome of the trial, we turn to other items that defendant contended were suppressed by the State. Specifically, defendant found a handwritten document in the Kearny police files which contained entries indicating that defendant's photograph had been shown to Pascuiti, Ann Marie DeMichelli and Chris Calabrese. The notes indicated that Pascuiti had rejected defendant's photograph because, unlike Landano, the suspect had curly hair, that Chris Calabrese, the operator of a coffee truck near the scene of the crime, had made similar comments, and that DeMichelli, a waitress who had seen Roller and his compatriot on the day before and the morning of the robbery, had also said defendant was not the man because the suspect was "younger looking." Defendant claimed that he had never been informed these individuals had been shown his photograph and had made "negative identifications." The district court agreed, finding that suppression of this note denied defendant a fair trial. Id. at 648-49. Specifically, the district court determined that "[t]he prosecution's failure to disclose the substance of these negative identifications constitute[d] a suppression of ... valuable exculpatory evidence." Ibid.
*23 Defendant contended that other items were not disclosed to the defense. Among these materials was a report prepared by members of the Newark Police Department's internal affairs bureau. The report indicated that Jacob Roth had been interrogated regarding his business dealings with John Snow and that he was specifically asked whether he had given the officer illegal gratuities. This interrogation took place on the morning of August 31, 1976. It will be recalled that later that day Roth positively identified defendant as the robber, although only several days before he had indicated that he was unsure.
Another item allegedly suppressed by the State was an empty photograph envelope which memorialized an apparent identification of Forni as the getaway driver. Although no reference appeared on the envelope ascribing the identification to any particular witness, none of the discovery that had been given to the defense corresponded with this entry.
Citing this evidence, the district court concluded that there was "a pattern of failures by the prosecution ... to live up to its good faith duty to turn over exculpatory information." Id. at 646. The district court noted that "[t]his pattern support[ed] the position asserted by [the defendant] from the outset that the prosecution suppressed evidence exculpatory to him and inculpatory of Forni." Ibid.
As we noted earlier, the Third Circuit reversed the district court's judgment. Landano v. Rafferty, 897 F.2d 661. It concluded that defendant's prior motion for a new trial and his petition for post-conviction relief, which alleged that the identifications made by Roth and Portas were coerced or tainted, did not satisfy the "exhaustion" requirements respecting Landano's new contentions. Id. at 675. The Court also determined that the allegation of systematic, bad faith suppression was not an appropriate basis for waiving the exhaustion requirement. Ibid. Accordingly, the Third Circuit directed the district court to vacate its grant of habeas corpus and "all orders it issued in this matter subsequent to its initial order denying Landano's petition." Ibid. The Court *24 added that "Landano [was] free to exhaust his available state remedies with respect to his present Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] claims and thereafter petition the federal courts if necessary." Ibid. Judge Rosenn dissented on the ground that defendant had established a systematic and continuing course of prosecutorial misconduct which could only be remedied by immediate federal intervention. Id. at 675-76. The United States Supreme Court denied certiorari. Landano v. Rafferty, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 23 (1990).
We need not describe in detail the immediate aftermath of the Third Circuit's judgment. We merely note that complex questions relating to bail and jurisdiction were presented and ultimately resolved. As a result of lengthy proceedings, we continued defendant on bail.

F. DEFENDANT'S SECOND PETITION FOR POST-CONVICTION RELIEF

Defendant then filed a petition for post-conviction relief in the Law Division. In his petition, defendant contended that the State had suppressed the Basapas/Pasapas continuation report, the Newark Police Department's report indicating that on the day Jacob Roth positively identified Landano, he had been interrogated concerning allegations that he paid illegal gratuities to Officer Snow, the handwritten notes disclosing that Pascuiti, DeMichelli, and Calabrese had been shown Landano's photograph and had "ruled him out" as a suspect, and the empty photograph envelope with the notation that Forni had been identified as the getaway driver. In the proceedings before the Law Division, defendant conceded that these claims had been "previously litigated" in the State courts. Based upon that representation, Judge Walsh, who as we noted had been recalled, dismissed the petition. The judge added that he "had not seen one shred of credible evidence ... that any prosecutorial misconduct was involved at any time in the prosecution of this case," and that, in any event, the newly discovered evidence would not have changed the outcome of the *25 trial had it been disclosed. Judge Walsh subsequently denied reconsideration, and defendant appealed.
In an unreported opinion, we reversed the Law Division's order and remanded the matter for an evidentiary hearing. In our opinion, we said that the allegations resulting in the district court's latest findings were "so serious" as to override the procedural bar that might otherwise apply under R. 3:22-4 and -5. We also observed that our courts have an independent "obligation to entertain applications for post-conviction relief, R. 3:22-1 et seq., when a conviction is based on a violation of constitutional rights or a fundamental injustice" under R. 3:22-2. We further stressed the "judicial obligation to conduct evidentiary hearings when material issues of fact are in dispute." See State v. Preciose, 129 N.J. 451, 462, 609 A.2d 1280 (1992). We thus directed the Law Division to conduct an evidentiary hearing regarding defendant's allegations of "newly discovered facts." We added that if defendant's new claims of prosecutorial suppression were found to have merit, they might well "impact on the previously considered issues." In that respect, we said that the procedural rules, which generally bar consideration of issues not previously raised and reconsideration of previously litigated issues, must give way to fundamental fairness.

G. THE LAW DIVISION'S FINDINGS ON REMAND

The Law Division conducted an extensive evidentiary hearing on defendant's new claims of suppression. The court first considered the Basapas/Pasapas report. Initially, the court rejected defendant's claim that the reference to Basapas or Pasapas evidenced the existence of an undisclosed witness who had identified Forni as the getaway driver. The court also found no basis for defendant's alternative claim that the entry referred to Gus Lapas, the owner of a coffee truck who had previously been questioned concerning his observation of the driver of the getaway car. The court found that, in actuality, Lapas was shown a group of photographs on August 19, 1976 and tentatively identified Bruce *26 Reen as "look[ing] like the man who was driving the car." The court determined that the reference to Basapas or Pasapas was actually a spelling "corruption" of Joseph Pascuiti. In support of its conclusions, the court noted that Pascuiti's name was spelled five different ways in the various reports contained in the files of the Hudson County Prosecutor's Office and the Kearny Police Department, that an intensive investigation of federal and state agency files and the employment records of Spectraserv, Inc., the successor to Modern Transportation Company, disclosed no person bearing the name of Joseph Basapas or Pasapas, and that Pascuiti's trial testimony mirrored the reference to an eyewitness's tentative identification of Forni.
In addition, the court cited evidence that contained the implication the Basapas/Pasapas report was in fact disclosed to the defendant prior to trial. Judge Walsh did not make a definitive finding in that respect. Instead, he "assume[d]" that the report had been suppressed, but nevertheless concluded that it would not have changed the result of the trial had it been disclosed. The judge conceded that the "suppressed document [was] arguably exculpatory," because on cross-examination, defense counsel could have used the report "to drive home the point that Pascuiti had in fact selected Victor Forni's photograph." The judge observed that on recross-examination, counsel would "have been in a better position" to rebut Pascuiti's testimony on redirect that he had not made a certain identification respecting the man who shot Officer Snow. The judge nonetheless concluded that the report would have been of marginal assistance to defense counsel had it been disclosed, and that its suppression did not impair defendant's right to a fair trial.
Judge Walsh also made extensive findings concerning the handwritten notes referring to the negative identifications by Pascuiti, DeMichelli and Calabrese. The evidence disclosed that this document was prepared by William J. Thompson, formerly a detective with the Kearny Police Department. Thompson characterized the notes as mere "doodling," but conceded that it reflected his *27 interviews with the named witnesses. Specifically, Thompson testified that he "wrote ... down on a scratch pad" the "thoughts that were mentioned" in his interviews. Thompson's official report indicated in a somewhat obscure way that a photographic array including Landano's photograph had been shown to the witnesses and that they had failed to make a tentative or positive identification. Although the record is not entirely clear on this point, this official report and another one of similar import, prepared by a different member of the Kearny Police Department, had apparently been supplied to the defense prior to trial. However, none of the documents given to the defense disclosed that Pascuiti, DeMichelli and Calabrese had been specifically directed to Landano's photograph and had responded that he was not one of the robbers. To that extent, defendant's claim that he was never informed of these negative identifications was borne out by the evidence presented at the hearing.
Judge Walsh nevertheless rejected defendant's assertion that the police had shown only his photograph singly to the named witnesses. Moreover, the judge found that the document would not have materially assisted defense counsel had it been disclosed. Again, the judge made no definitive finding that Thompson's handwritten notes had been suppressed by the prosecutor. However, he "assume[d]" that the document had not been disclosed based upon the evidence presented. The judge nevertheless concluded that the notes were not material to the issue of defendant's guilt or innocence.

H. THE JUDGE'S CONCLUSIONS ON THE SECOND REMAND

During the pendency of this appeal, we remanded the matter to the Law Division a second time for further findings. We will describe the reasons for the remand later in our opinion. It suffices to say here that we requested the judge to reconsider the *28 question of the materiality of the suppressed evidence applying a slightly different standard.
Following oral argument, the judge concluded that none of the suppressed items was material to the issue of the defendant's guilt or innocence. In addition to making the requested findings, the judge made a cryptic and enigmatic reference to Thompson's handwritten notes and observed for the first time that the defense had not satisfied its burden of showing that these notes were suppressed by the State. No reasons were given supporting this conclusion. No fact findings were made. And no evidence was cited. We add that the prosecutor never contended that the Thompson notes had been disclosed to defendant's trial attorney. We will discuss this point subsequently.

II.

A. THE QUESTION OF SUPPRESSION OF EVIDENCE

Initially, we hold that Judge Walsh's findings of fact regarding the Kearny Police Department continuation report were supported by substantial, credible evidence present in the record. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). More specifically, the hearing transcript amply supports the judge's conclusion that the Basapas/Pasapas entry in the Kearny Police continuation report actually referred to Pascuiti's identification of Forni as the man who shot Officer Snow and drove the getaway car. We need not recite the evidence supportive of that conclusion. Instead, we merely refer to Judge Walsh's meticulous and exhaustive analysis of the evidence presented regarding that question. We make one further observation. Based upon our independent review of the voluminous record, we harbor serious reservations regarding defendant's claim that this report was not supplied in pretrial discovery. For these reasons, we need not, and do not, address questions relating to the materiality of the allegedly suppressed report.
*29 We also see no need to reopen the factual questions resolved by the Law Division in prior proceedings. For example, we are satisfied that the Law Division was correct in rejecting defendant's evidence regarding Roller's alleged recantation. We previously alluded to the weakness of defendant's proof that Roller exonerated defendant in conversations with other inmates. Nothing that has been presented to date requires a reevaluation of the Law Division's conclusion that Roller's alleged recantation was untrustworthy and incredible.
The Law Division's disposition of Portas's recantation is more troublesome. As we noted earlier, the Law Division conducted an evidentiary hearing respecting this question and found that Portas's recantation was unbelievable. The district court also conducted an evidentiary hearing at which Portas testified and its findings and conclusions directly contradicted those made by the Law Division. We find no merit in defendant's argument that we are bound by the district court's conclusions concerning Portas's veracity. Although the district court raised serious questions concerning the Law Division's rejection of Portas's recantation, it nevertheless found no basis to overrule the State court's findings and conclusions. The district court's independent findings were not necessary to the judgment it rendered and thus have no collateral estoppel effect. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552, 559 n. 5 (1979); Norton v. Larney, 266 U.S. 511, 517, 45 S.Ct. 145, 148, 69 L.Ed. 413, 417 (1925); Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168 (5th Cir.1981); Stovall v. Price Waterhouse Co., 652 F.2d 537, 540 (5th Cir.1981); Memorex Corp. v. International Business Machs. Corp., 555 F.2d 1379, 1384 (9th Cir.1977); Halpern v. Schwartz, 426 F.2d 102, 105 (2d Cir.1970). Having said this, we note that some of the new materials discovered by defendant arguably support the veracity of Portas's recantation testimony. Specifically, the empty photograph envelope bearing a reference to an identification of Forni as the getaway driver is susceptible to such an interpretation. In light of our disposition of the other *30 issues in this case, no purpose would be served by reopening this question.
While we sustain all of the Law Division's factual findings, we nevertheless conclude that the State either purposefully or inadvertently failed to disclose exculpatory evidence to the defense prior to trial. It is undisputed that the prosecutor did not apprise the defense of exculpatory evidence indicating that Roller and Forni had engaged in a series of armed robberies of a Perth Amboy coin shop. We will discuss the significance of this evidence later in our opinion. We merely note here that the prejudice emanating from this omission was compounded by the later discovery of new evidence which disclosed that Roller and Forni engaged in a robbery in Jersey City during which Forni's gun, the same Browning automatic used to kill Officer Snow, was fired.
The State also does not dispute the fact that the prosecution withheld information it engaged in an investigation of Jacob Roth concerning "money laundering" and "loan sharking," and that Roth was questioned concerning allegations he gave illegal gratuities to Officer Snow on the very day that he positively identified Landano as one of the robbers. The record establishes beyond question that none of this information was disclosed to the defense.
That leaves us with the question of Thompson's handwritten notes. As we said earlier, in his initial opinion rendered after the evidentiary hearing on defendant's petition for post-conviction relief, Judge Walsh made no definitive finding regarding whether Thompson's handwritten notes were turned over to the defense before trial. Instead, based on the evidence that had been presented, he "assume[d] that [the] document ... was not turned over, but was suppressed by the State." In his supplemental opinion following our second remand order, the judge, for the first time, "point[ed] out that [defendant] ha[d] not carried [his] burden of proof as to [the] suppression" of this evidence.
*31 We reject that cryptic and unsupported conclusion.[10] Not even the State has ever contended that Thompson's notes were disclosed to the defense. In fact, the State, in its supplemental brief, specifically concedes that these notes were never given to the defendant and that they remained in the files of the Kearny Police Department until seized by the United States Marshal.
It will be recalled that Thompson's notes were found in the files of the Kearny Police Department after these files were seized by the United States Marshal pursuant to the order of the United States District Court. There is no trace of this document in the Hudson County Prosecutor's files or in the files of any of the defense attorneys. A pretrial discovery stipulation prepared by the prosecutor and given to defendant's trial attorney did not mention this document, although it identified every witness's statement and every investigative report to be supplied.
Moreover, the judge's belated conclusion that defendant failed to satisfy his burden of proving suppression is inconsistent with the court's prior factual findings set forth in the written opinion denying defendant's petition for post-conviction relief. There, the judge noted that the document does not have the appearance of an official report. Instead, it is an ordinary piece of 8 1/2 inch by 14 inch lined paper from a legal pad which carries no preprinted heading or date. In his original opinion, the judge concluded that Thompson's official report and his handwritten notes were prepared contemporaneously. This finding was supported by Thompson's testimony. Thompson stated that his handwritten notes were of the type generally used for the purpose of preparing his official report. These notes are usually discarded after the official report is completed. Although Thompson's official report was *32 turned over to the prosecutor,[11] and later to the defense, the evidence indicates that his handwritten notes were not provided.[12] Instead, the notes remained in the Kearny Police Department files.

B. THE STANDARD OF MATERIALITY

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where [it] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [State]." Id. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218. In order to establish a Brady violation the defense must demonstrate that (1) the prosecutor failed to disclose the evidence, (2) the evidence was of a favorable character for the defense, and (3) the evidence was material. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); cf. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Because of the many kinds of evidence that can be considered favorable to a defendant, our Supreme Court developed *33 different rules concerning the standard of materiality for determining whether a Brady violation required a new trial. State v. Carter, 85 N.J. 300, 311-12, 426 A.2d 501 (1981). Three general factual settings were considered. First, where the prosecution knowingly used perjured testimony, the Court has held that the conviction will be set aside if there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349-50. The second situation, illustrated by the facts in Brady, is one in which the defense has made a specific request for the withheld evidence. The Court has determined that the conviction must be vacated if the suppressed evidence might have affected the outcome of the trial. Id. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350. The third variation is found where the defense has made no request, or only a general one, for the undisclosed material. In that setting, a reversal is required if the "omitted evidence creates a reasonable doubt that did not otherwise exist." Id. at 112, 96 S.Ct. at 2401, 49 L.Ed.2d at 355.
In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, the Court revisited this area and abrogated these rules. Specifically, the Court held that the standard adopted in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was "sufficiently flexible to cover the `no request,' `general request,' and `specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. Under that formulation, the materials suppressed by the prosecution are considered material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Ibid. The Court added that "`a reasonable probability' is a probability sufficient to undermine confidence in the outcome." Ibid.
Until recently, New Jersey cases dealing with prosecutorial suppression of exculpatory evidence mirrored federal precedents. In State v. Carter, 85 N.J. at 312, 426 A.2d 501, our Supreme court *34 adopted the "sliding scale" analysis originally enunciated by the United States Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. Materiality of the suppressed evidence was said to depend upon whether and to what extent the defense requested pretrial disclosure. State v. Carter, 85 N.J. at 311-12, 426 A.2d 501. In its later opinion in the same case, the Court ordered that where a specific request was made for the suppressed evidence, the "might have affected the outcome of the trial" test was "synonymous with harmless [constitutional] error." State v. Carter, 91 N.J. 86, 113-14, 449 A.2d 1280 (1982). In such cases, the Court said that the materiality of the suppressed evidence hinged upon whether the prosecutorial dereliction was "harmless beyond a reasonable doubt." Ibid.
In State v. Marshall, 123 N.J. 1, 586 A.2d 85 (1991), our Supreme Court "decline[d] to accept ... [the] standard of materiality enunciated in [Bagley]." Id. at 200, 586 A.2d 85. Instead, the Court retained the "harmless constitutional error" criterion, at least where the "defendant has made a specific request for the nondisclosed information." Id. at 199, 586 A.2d 85.
Our opinion in State v. Engel, 249 N.J. Super. 336, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991) followed on the heels of the Marshall decision. In Engel, the defense had made a specific request for a document that the prosecutor inadvertently failed to disclose. Id. at 393, 592 A.2d 572. Citing Marshall, we held that the "harmless constitutional error" standard was the appropriate criterion for determining whether a reversal and a new trial were required. Id. at 392, 592 A.2d 572. In the course of our opinion, we suggested the possibility that our Supreme Court wished to retain the "sliding scale" analysis enunciated in Agurs and later adopted in State v. Carter, 85 N.J. at 312, 426 A.2d 501. If so, we surmised that the appropriate test of materiality in cases in which no request or only a general request was made for the suppressed evidence would be whether the "`omitted evidence creates a reasonable doubt that did not otherwise exist.'" State v. Engel, 249 N.J. Super. at 392, *35 592 A.2d 572 (quoting United States v. Agurs, 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355).
In his opinion denying defendant's latest petition for post-conviction relief, Judge Walsh found that defendant had made only a general request for the suppressed evidence. Citing the dictum in Engel, the judge concluded that the most stringent standard of materiality was applicable, i.e., defendant's conviction was to be set aside only if the suppressed evidence created a reasonable doubt that did not otherwise exist. The matter came to our attention in the course of resolving a procedural point during the pendency of this appeal. We were concerned with the possibility that the standard of materiality adopted by the United States Supreme Court in Bagley might be considered more lenient than that applied under the traditional "sliding scale" analysis in cases where the defense made no request or only a general request for the suppressed evidence. In order to foreclose any possibility that defendant might be prejudiced, we remanded the matter to the Law Division and directed Judge Walsh to make alternative findings under the Bagley standard of materiality. The judge subsequently issued a letter opinion in which he found there was "no reasonable probability" the result of the trial would have been different had the evidence been disclosed to the defense.
We take this opportunity to clarify the standard of materiality applicable to cases in which the defense made no request or only a general one for the suppressed evidence. Obviously, New Jersey's standard for determining whether a reversal is required where the prosecutor has withheld exculpatory evidence may not be more stringent than that required by the federal constitution. Candor requires us to admit that we discern little, if any, practical difference in the two standards of materiality. It is difficult for us to envision a case in which there is a reasonable probability that the suppressed evidence would affect the outcome of the trial, but would not create a reasonable doubt that did not otherwise exist. Although the two standards are phrased differently, we find it difficult to imagine a scenario in which one test would yield a *36 reversal, but the other would not. No matter how the test is articulated, the question of whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. See State v. Macon, 57 N.J. 325, 335, 273 A.2d 1 (1971).
Although we tend to think that the standards are indistinguishable, we are convinced that the more prudent and better course is to apply the Bagley standard in cases in which either no request or only a general request was made for the suppressed evidence. See State v. Florez, 134 N.J. 570, 593, 636 A.2d 1040 (1994). Therefore, in such cases, a reversal is required "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. A reasonable probability is one "sufficient to undermine confidence in the outcome." Ibid.

C. MATERIALITY OF THE EVIDENCE SUPPRESSED

We now apply that standard to the facts of this case.[13] We first consider the State's suppression of evidence relating to the Perth Amboy robberies. As we mentioned earlier, Roller pled non vult to felony murder. At trial, he testified that in exchange for his plea, the prosecutor agreed to dismiss all other counts of the indictment and to recommend that his sentence not exceed 30 years. Roller also stated that the prosecutor promised to dismiss another charge of armed robbery pending against him which *37 involved a tavern known as "Mike's Bar" in Jersey City. When cross-examined about that incident, Roller initially responded that "three holdup men" were involved. However, Roller refused to reveal their identities. After being directed by Judge Walsh to respond to the question, Roller changed his testimony and claimed that only two men had participated in the Jersey City robbery. Roller repeatedly denied that he had ever participated with Forni in committing other crimes. While admitting that Forni had assisted him in planning the Kearny robbery and that Forni's gun had been used to kill Officer Snow, Roller denied that Forni played any role in the robbery itself.
It is apparent that the State deliberately concealed evidence implicating Roller and Forni in the robberies of the Perth Amboy Coin Exchange. A witness to those crimes was presented with photographs of suspects and tentatively identified Roller, Forni and Reen as the probable perpetrators. Another witness corroborated the fact that Roller was one of the participants. The Hudson County Prosecutor's Office was notified of this development in order to arrange a line-up. As the result of ongoing extradition proceedings against Forni and Reen, the line-up was postponed indefinitely. The person in charge of the investigation of the Snow killing requested that the law enforcement officer overseeing the investigation of the Perth Amboy robberies not publicize the Coin Exchange matter "in order not to jeopardize any potential plea agreement." As we noted earlier, the assistant prosecutor who tried the Landano case was unaware of the details pertaining to the investigation of the Perth Amboy robberies. However, there is substantial authority supporting the proposition that the knowledge of "one member of a prosecutor's office is to be imputed to another in the context of a Brady violation." State v. Engel, 249 N.J. Super. at 396, 592 A.2d 572 (citing Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir.1987); United States v. Antone, 603 F.2d 566, 570 (5th Cir.1979); United States v. Ruiz, 711 F. Supp. 145, 147 (S.D.N.Y. 1989), aff'd, 894 F.2d 501 (2d Cir.1990); Buitrago v. Scully, 705 F. Supp. 952, 956 (S.D.N.Y. 1989); Graham v. Wilson, 645 F. Supp. 664, 672-73 (D.Colo. 1986), order vacated, *38 828 F.2d 656 (10th Cir.1987), cert. denied, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988); Taylor v. Maggio, 581 F. Supp. 359, 362 (E.D.La.), appeal dismissed, 727 F.2d 341 (5th Cir.1984); cf. Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104, 108-09 (1972)). These decisions hold that "knowledge of the particular prosecutor trying the case is not required." Ibid.
The suppressed evidence was relevant for several reasons. It could have been used to further impeach Roller's credibility. Although Roller's truthfulness was seriously impugned in the course of cross-examination, his willingness to lie in order to protect Forni would have further undermined his account of the robbery. More importantly, the suppressed evidence established an ongoing criminal confederacy between Roller and Forni. Defendant could have used this "other crime" evidence defensively because it clearly tended to negate his guilt respecting the robbery of the Hi-Way Check Cashing Service and the murder of Officer Snow. See State v. Garfole, 76 N.J. 445, 453, 388 A.2d 587 (1978); State v. Williams, 214 N.J. Super. 12, 20, 518 A.2d 234 (App.Div. 1986); 2 Wigmore on Evidence § 304 at 205, § 341 at 245 (3d ed. 1940). In view of the many parallels between the Kearny and Perth Amboy robberies, it was reasonable to conclude that the same perpetrators were involved. See United States v. Stevens, 935 F.2d 1380, 1401 (3d Cir.1991). Evidence that Roller and Forni were partners in a continuing criminal venture tended to shore up defendant's argument that Roller was attempting to ensnare him and protect his criminal compatriot.
As we said earlier, the prejudice emanating from the suppression of this evidence was compounded by subsequent developments relating to the investigation of the armed robbery of Mike's Bar. Fingerprint and ballistics evidence clearly established that Roller and Forni committed that crime and that Forni's gun was fired in the course of the robbery. Collectively, these incidents constituted highly persuasive evidence linking Forni to the Kearny robbery. This evidence would have been particularly compelling *39 in light of Pascuiti's tentative photographic identification of Forni as the triggerman and the driver of the getaway car.
We now turn to the State's failure to apprise the defense of its investigation regarding Jacob Roth's business dealings. At the outset, we do not find particularly compelling the assistant prosecutor's allusion in his Kean College address to having "coerce[d]" Roth to "cooperate." The assistant prosecutor's choice of language was nothing more than a rhetorical flourish.
It is nevertheless undisputed that the State engaged in an intensive inquiry into Roth's activities in the course of its investigation of the killing of Officer Snow. Of particular interest to the State was the possibility that Roth had paid illegal gratuities to the police officer. We now know that on the very day Roth positively identified Landano as one of the robbers, he was questioned by members of the internal affairs bureau of the Newark Police Department with regard to that possibility.[14] Only several days before, Roth expressed some uncertainty as to whether defendant was the perpetrator. The reason for his abrupt change of mind was the subject of much debate at trial. In his trial testimony Roth emphasized that the perpetrator had a Fu Manchu mustache. Yet in the first photographic array, Landano was depicted with a slight mustache, and in the second, he was clean-shaven. During his summation, defense counsel specifically alluded to the subject and rhetorically inquired what prompted Roth's change of mind. The prosecutor responded in his summation that "throughout this case there is no suggestion of police malpractice or coercion on these [photographic] selections[,]" and *40 "if you believe the defense, it's a gigantic coincidence that Jake Roth, on the 31st says, now I'm positive."
The law enforcement authorities' investigation of Roth would have been an appropriate subject of inquiry on cross-examination. The relevant question was whether there was a motive or interest that affected Roth's credibility. Roth's knowledge that law enforcement authorities were investigating his business dealings with underworld figures and with Snow might have prompted him to solidify his identification of Landano. He might have believed that he would receive favorable treatment if he were to cooperate with the State in its prosecution of Landano.[15]
In an unbroken line of decisions, our courts have held that the pendency of charges or an investigation relating to a prosecution witness is an appropriate topic for cross-examination. See, e.g., State v. Taylor, 49 N.J. 440, 447-48, 231 A.2d 212 (1967); State v. Mathis, 47 N.J. 455, 468-69, 221 A.2d 529 (1966); State v. Curcio, 23 N.J. 521, 525, 129 A.2d 871 (1957); State v. Spruill, 16 N.J. 73, 78, 106 A.2d 278 (1954); State v. Rodriguez, 262 N.J. Super. 564, 570-71, 621 A.2d 532 (App.Div. 1993); State v. Mazur, 158 N.J. Super. 89, 104-05, 385 A.2d 878 (App.Div.), certif. denied, 78 N.J. 399, 396 A.2d 586 (1978); State v. Baker, 133 N.J. Super. 394, 397, 336 A.2d 760 (App.Div. 1975); State v. Zwillman, 112 N.J. Super. 6, 18-19, 270 A.2d 284 (App.Div. 1970), certif. denied, 57 N.J. 603, 274 A.2d 56 (1971); see also Annotation, Preventing or Limiting Cross-Examination of Prosecution's Witness as to His Motive for Testifying, 62 A.L.R.2d 610 (1958). The basic question is one of interest. State v. Spruill, 16 N.J. at 78, 106 A.2d 278. "Every fact or circumstance tending to show the jury the witness'[s] relation to the case or the parties is admissible to the end of determining the weight to be given to his evidence." Ibid. The fact that the witness denies holding any expectation of leniency is *41 not a proper basis for barring or curtailing cross-examination on the subject. State v. Baker, 133 N.J. Super. at 397, 336 A.2d 760. Our Supreme Court has held that prosecutorial suppression of evidence relating to a witness's possible interest constitutes a violation of the defendant's right to due process. State v. Spano, 69 N.J. 231, 235, 353 A.2d 97 (1976). That principle applies with equal force here.
We stress that Jacob Roth was the only witness at trial who firmly and positively identified Landano as one of the robbers. Although he did not witness the killing and his testimony was somewhat inconsistent with that of his son, Jacob Roth was undoubtedly an important witness and the jury could have reconciled the contradictions regarding the chronology of events. It is abundantly plain that the jury carefully scrutinized Roth's testimony. In the course of its extensive deliberations, the jury asked to have his testimony reread. The jury also asked for clarification of the photographic arrays shown to Roth and requested copies of his identification statements. The State's suppression of evidence relating to Roth's business dealings clearly deprived Landano of an important weapon for his defense.
The State also failed to disclose Thompson's handwritten notes. It will be recalled that these notes reflected negative identifications of defendant by Pascuiti, DeMichelli and Calabrese. Specifically, the notes memorialize the reactions of the individuals listed to a photograph of Landano. We do not suggest that a single photograph of defendant was shown rather than a photographic array. Judge Walsh carefully considered that prospect but found that other evidence in the case militated against such a conclusion. We agree. The fact remains that at some point Pascuiti, DeMichelli and Calabrese were asked for their reactions to Landano's photograph and each rejected it. The defense knew that each of these individuals failed to select defendant's photograph from an array. However, the defense did not know that each individual's attention was directed to Landano's photograph and each apparently ruled him out as a suspect.
*42 The effect of the prosecutor's failure to disclose this evidence was negligible with respect to Calabrese. On various dates, Calabrese had identified different people as resembling an individual he had seen at his coffee truck on the morning of the robbery. On one occasion, he identified Terrence Karl Alden. On another, he selected Forni's photograph. On still another occasion, he selected a photograph of defendant as "the closest to the guy I remember being at the truck but heavier." Calabrese did not testify at trial. Had he been called as a defense witness, the prosecutor would have confronted him with his identification of Landano. Suppression of Calabrese's negative identification had no impact on the outcome of the trial.
The same cannot be said as to Pascuiti. He was the only individual to actually witness the shooting. Undoubtedly, he was a key witness at trial. On cross-examination, Pascuiti admitted that he had identified a photograph of Forni from a photographic array. He also noted that the suspect had curly hair. However, on redirect examination, Pascuiti said he was "not certain of anyone" and had not selected any photograph from the display. The defense was not aware of what we know today, i.e., that Pascuiti said in effect that the photograph of Landano did not depict the perpetrator because Landano's hair is straight and that of the suspect was curly. Had defense counsel been advised of Pascuiti's rejection of defendant's photograph, he could have argued to the jury that the only eyewitness to the shooting had ruled out Landano as the perpetrator.
Although DeMichelli was not as important a witness as Pascuiti, her testimony might well have left a lingering suspicion in the minds of the jury that she had seen the defendant shortly before the robbery. The thrust of her testimony was that on the afternoon of August 12, 1976, Roller and a dark-haired, mustached man had been in the diner in which she worked, and that the following morning, August 13, 1976, Roller bought two containers of coffee. DeMichelli unequivocally identified Roller because of his distinctive appearance. DeMichelli testified that she was *43 shown numerous photographs, but could not identify the dark-haired individual. Although she thought that Forni's photograph "looked familiar," she also noted that she couldn't "be sure" whether she had seen the defendant before. In response to the prosecutor's questions, DeMichelli twice replied "[i]t could be him," if he wore a mustache. Armed with Thompson's notes, defense counsel would have been able to confront DeMichelli with her prior statement that the suspect was "younger" than the person, Landano, in the photograph.
Standing alone, we would not consider any of these instances of prosecutorial suppression to be so egregious as to have deprived defendant of a fair trial. But the impact of each discrete item that was withheld by the State cannot be viewed in isolation. Never before the discovery of this evidence could defendant argue so persuasively that Roller was an unmitigated liar incapable of telling the truth, that Roth's firm identification was tarnished by self-interest, and that Pascuiti and DeMichelli had ruled him out as a suspect in the case.
We are also obliged to consider the strength or weakness of the State's case against Landano as a whole. The trial judge characterized the State's evidence as "overwhelming." The judge had the opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy. We recognize the limitations of reviewing a printed record. Nevertheless, we question the strength of the State's case against Landano, resting as it did on the frailties of weak identification evidence and Roller's untrustworthy testimony. The question remains whether the jury's verdict might have been different had the suppressed materials been disclosed to the defense. Such an exercise necessarily requires the reviewing court to engage in speculation. One point is abundantly plain. Whatever way we may characterize the strength or weakness of the State's evidence, the jury found this to be a very close case. The length of the jury's deliberations, its numerous requests to have the testimony reread and its professed *44 inability to reach a unanimous verdict starkly reveal the fragility of its conclusion.
Against this backdrop, we hold that there is a reasonable probability the outcome of the trial would have been different had the evidence withheld by the State been disclosed. This constitutional violation undermines our confidence in the validity of the jury's verdict.
The order denying defendant's petition for post-conviction relief is reversed and the matter is remanded to the Law Division for a new trial.
NOTES
[1] Forni and Reen were later tried and convicted of conspiracy to commit armed robbery and murder. They were acquitted on all other counts.
[2] Roth testified that prior to his court appearance he had twice "positively" identified defendant's photograph when shown a photographic array. Contrary to Roth's testimony, three law enforcement officers described Roth's initial identification on August 26, 1976 as "tentative." They further testified that Roth's subsequent identification on August 31, 1976 was more "positive."
[3] On cross-examination, however, Jacob admitted that in his signed statement he claimed a red-bearded man had entered the trailer. Jacob asserted that this discrepancy in his statement was based upon what his son, Jonathan, had told him.
[4] At trial, Jose Alvarez testified that, at approximately 6:30 a.m. on August 13, 1976, he saw a red-haired, bearded man wearing a hat similar to that found in the car, walking with two other individuals in the parking lot from which the green Chevrolet was stolen.
[5] An expert presented by the defense testified that while he could not absolutely rule out that the hairs found in the denim hat were defendant's, he found it more likely that they came from another individual.
[6] In his address at Kean College, the assistant prosecutor admitted that the jacket or vest found in the car did not fit the defendant. Nothing was said about the hat. At trial, defendant tried on the hat and testified that it did not fit him.
[7] The instruction given by the trial court was subsequently rejected in State v. Czachor, 82 N.J. 392, 413 A.2d 593 (1980). Although Czachor was given limited effect to pending cases where the parties had not yet exhausted all avenues of direct review and was thus applicable to the Landano trial, see State v. Burstein, 85 N.J. 394, 407-08, 427 A.2d 525 (1981), we found the supplemental instruction to be harmless error when we decided defendant's direct appeal.
[8] Roth surrendered his license to conduct a check cashing business four days after defendant was sentenced. However, he was never charged with committing a crime.
[9] We use the words "Basapas/Pasapas" because the first letter of the individual's name in the report is not legible.
[10] We stress that the Law Division judge's conclusion regarding whether defendant sustained his burden of proof is not entitled to the same deference as his factual findings. Coffin v. Kelly, 133 N.J.L. 252, 44 A.2d 29 (E. & A. 1945).
[11] Of course, the problem is that the official report which was disclosed to defendant's trial attorney merely indicated that Pascuiti, DeMichelli and Calabrese were shown a photographic array and failed to make an identification. In contrast, Thompson's handwritten notes indicated that Pascuiti rejected defendant's photograph because his "hair [was] not right [and] the suspect had curly hair." His notes further disclosed that Calabrese rejected defendant's photograph for the exact same reason. And finally, Thompson's notes indicated that DeMichelli rejected defendant's photograph because the suspect was "younger looking."
[12] We may speculate as to the reason. Perhaps Thompson believed that his official report contained essentially the same information as set forth in his handwritten notes. The witness's testimony at the hearing indicates that he did not fully appreciate the difference between the witnesses' failure to make an identification from a photographic array and their outright rejection of defendant's picture as resembling one of the suspects.
[13] While we sustain all of the Law Division's factual findings, we note that issues of materiality under Brady are "mixed question[s] of law and fact." Carter v. Rafferty, 826 F.2d 1299, 1306 (3d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). Accordingly, the Law Division's resolution of questions pertaining to materiality are not entitled to the same degree of deference that is to be accorded its determination of factual issues. Moreover, as we noted previously, instances of prosecutorial suppression in this case must be viewed collectively. The question presented is whether there is a reasonable probability the outcome of the trial would have been different had all of the Brady materials been disclosed.
[14] The record seems to indicate that the Hudson County Prosecutor's Office had possession of the report prepared by the internal affairs bureau of the Newark Police Department. In any event, it is plain that the two investigative agencies cooperated with one another. The actions and knowledge of the internal affairs bureau must be imputed to the Hudson County Prosecutor's Office. State v. Engel, 249 N.J. Super. at 396, 592 A.2d 572; see also United States v. Antone, 603 F.2d at 570.
[15] In a note later found in the prosecutor's file, the assistant prosecutor who tried the Landano case had written that Jacob's tentative identification of the defendant was the "[b]iggest problem" in the case.