**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3885-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILLIE L. TANNER, a/k/a WILLIE
LEE TANNER, MOOKIE JACKSON,
MOOKY JACKSON, WILLIE
JOHNSON and MARK TERRELL,

    Defendant-Appellant.

_____

          Argued January 13, 2026 – Decided May 7, 2026

          Before Judges Sumners, Chase and Augostini.

          On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 04-01-0089 and 04-01-0106.

          Bruce I. Afran argued the cause for appellant.

          Nancy A. Hulett, Assistant Prosecutor, argued the cause for respondent (Linda Estremera, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the brief).

PER CURIAM

In February 2006, a jury found defendant Willie Tanner guilty of first-degree attempted murder, five counts of first-degree armed robbery, and other related offenses. He was sentenced to an aggregate forty-five-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirmed defendant's conviction, with a minor modification of his sentence. State v. Tanner, No. A-3509-06 (App. Div. Sept. 8, 2009) (Tanner I).

Defendant subsequently sought post-conviction relief (PCR) alleging ineffective assistance of trial and appellate counsel and prosecutorial misconduct. As to the latter claim, defendant alleged he was denied a fair trial because the State failed to disclose the psychiatric history of his cousin, co-defendant and critical State's witness at trial, W.J.[1]

The PCR petition was denied without an evidentiary hearing. On appeal, we affirmed in part and reversed and remanded in part. State v. Tanner, No. A-0929-13 (App. Div. July 26, 2016) (slip op. at 25) (Tanner II). "We reverse[d] the [PCR court's] order denying defendant's motions for a new trial based upon

---

[1] We use initials to protect the privacy of the witness's medical history. R. 1:38-3(a)(2).

A-3885-22

newly-discovered evidence regarding Johnson's plea bargain and psychiatric history." Id. at 26. We directed the PCR court to conduct an evidentiary hearing to address: (1) whether "the State's 'non-disclosure' of W.J.'s true plea bargain was a Brady[2] violation warranting dismissal of the charges"; and (2) whether the newly discovered evidence of W.J.'s mental health history at the time of trial was "sufficiently material" to the proofs supporting defendant's guilt warranting a new trial.

Due to recusals by two judges and COVID-19, the evidentiary hearing was delayed. During the pendency of the evidentiary hearing, defendant filed additional motions seeking a new trial based on: (1) the prosecutor's witness preparation procedures amounting to scripting the trial; and (2) the State committing a Brady violation by suppressing W.J.'s pre-trial preparation statement that he did not see a North Face logo on defendant's hat.

On July 7, 2023, following six hearing days over diverse dates, the PCR judge issued an order and written decision denying PCR and the motions for a new trial.

Defendant appeals, arguing:

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

POINT I

A REASONABLE PROBABILITY EXISTS THAT THE VERDICT WOULD HAVE BEEN DIFFERENT HAD THE JURY BEEN AWARE OF [W.J.'S] PSYCHOSIS AND THE IMPLICATIONS THIS DISEASE HAS FOR THE JURY'S ABILITY TO ASSESS THE RELIABILITY OF HIS TESTIMONY[.]

POINT II

THE PROSECUTION FAILED TO DISCLOSE BRADY MATERIAL CONSISTING OF A PSYCHOLOGIST'S REPORT THAT [W.J.] HAD SUCH COGNITIVE DEFICITS THAT HE WOULD NOT UNDERSTAND HIS MIRANDA[3] RIGHTS AND "WILL OVERBORNE" TO POLICE PRESSURE TO CONFESS[.]

POINT III

A NEW TRIAL IS REQUIRED BECAUSE [W.J.] ADMITTED DURING THE PCR HEARINGS THAT HIS TRIAL TESTIMONY THAT HE AND TANNER AGREED TO COMMIT ROBBERIES WAS NOT TRUE AND HE DOES NOT KNOW IF ANY ROBBERIES WERE COMMITTED[.]

POINT IV

THE STATE VIOLATED BRADY BY CONCEALING [W.J.'S] PRE-TRIAL STATEMENT THAT TANNER NEVER HAD THE NORTH FACE SKI MASK THAT WAS SEEN AND WORN IN THE CRIME SCENE VIDEOS[.]

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3885-22

POINT V

THE PROSECUTION SUPPRESSED [W.J.'S] STATEMENT THAT HE COULD NOT RECALL HIS POLICE CONFESSION AND HAD TO HAVE HIS MEMORY RE-STRUCTURED <u>TWO DAYS BEFORE</u> TRIAL, GIVING RISE TO A <u>BRADY</u> VIOLATION AND NEWLY-DISCOVERED EVIDENCE[.]

POINT VI

THE CONVICTION MUST BE VACATED BECAUSE THE PROSECUTOR SCRIPTED THE TESTIMONY FOR EACH AND EVERY STATE'S WITNESS IN THE TANNER TRIAL AND INCLUDED MISLEADING ANSWERS FOR TWO CRITICAL WITNESSES[.]

POINT VII

PROSECUTORIAL ERRORS, BOTH INTENTIONAL AND NEGLIGENT, CUMULATIVELY UNDERMINED THE FUNDAMENTAL FAIRNESS OF THE TRIAL AND REQUIRE VACATING THE CONVICTION[.]

Having considered the record, the parties' arguments, and the applicable legal principles, we conclude the State's failure to disclose a physician's oral report that W.J., the State's critical trial witness, had cognitive defects constitutes a <u>Brady</u> violation warranting a new trial.

5

# I.

## A.
### Defendant's Arrest & Trial

We incorporate herein the facts and procedural history set forth in Tanner I and Tanner II.  Therefore, we limit our recitation of the trial testimony that is relevant to this appeal.

A series of armed robberies occurred between August 5 and September 10, 2003, at a number of gas stations and convenience stores in Middlesex County.  The victims could not identify the robber because he wore a ski mask and provided inconsistent descriptions of the robber's physical description.  Surveillance video verified the events and revealed the robber's garb.

On October 2, 2003, defendant was arrested for possession of a gun after police suspected him of urinating in a public parking lot.  Police also found a black ski mask with a North Face logo in the parking lot.

Shortly after defendant's arrest, W.J. was driving when the East Brunswick police stopped him for breaking frequently, "as if [he] was looking for someone."  Police arrested him after finding a small bag of marijuana in his sock.  After waving his Miranda rights, W.J. told police that he drove defendant to the robberies, parked the car, waited for defendant's return, and then drove him home.  Over a month later, W.J. attempted suicide while in custody of the

6

Middlesex County Jail, resulting in his five-day psychiatric inpatient unit hospitalization.

In exchange for his cooperation and truthful testimony at defendant's trial, W.J. plead guilty to conspiracy to commit robbery, and the State agreed to recommend a maximum prison term of three years, subject to NERA. At defendant's trial, W.J. testified that he drove defendant to commit four-armed robberies of Middlesex County gas stations and convenience stores during the summer of 2003.[4] He stated that when defendant exited his car, he wore a black "hat" and "figured" defendant had a weapon with him, because he could see a "bulge" in defendant's pocket or waistband. The defense scrutinized W.J.'s plea agreement on cross-examination. Without the deal, W.J. testified that he would have faced "something like 50 years" resulting from roughly "40 something" charges.

Defendant testified in his own defense, denying he committed the robberies. He denied owning a black North Face ski mask. He described W.J. as his stepfather's nephew, claiming they were not close even though he knew him for about twenty-two years. He claimed that W.J.'s family never accepted

---

[4] The robberies occurred in South Brunswick on August 5, 2003; Edison on August 16, 2003; North Brunswick on August 28, 2003; and Edison on September 10, 2003.

A-3885-22

him and his mother as a "blood family." He stated W.J. committed the robberies, but that it was "easier" for the police to "pin the blame" on him because he was a convicted felon. He also claimed W.J. falsely testified against him because of W.J.'s plea deal with the State. He described W.J. as not very bright and easily manipulated.

The jury found defendant guilty on all charges except second-degree aggravated assault with a deadly weapon for which it found him guilty of the lesser-included offense of third-degree aggravated assault with a deadly weapon. Apparently, the jury believed W.J. and the circumstantial evidence[5] presented by the State, but not defendant's denial.

---

[5] In its remand decision, the PCR court cited the following circumstantial evidence supporting defendant's conviction: (1) videos of the robberies; (2) photos from the robberies; (3) the North Face black hat matching the ski mask worn by the robber, which was recovered in the parking lot when defendant was arrested; (4) a silver-plated revolver recovered from defendant matched the revolver seen in the videos; (5) a bulky watch seen in the videos was similar to the watch worn by defendant when he was arrested; (6) photos showed the robber with a scar in his mustache, which defendant also had; (7) a shell casing seized from defendant's revolver matched the projectile that was found at one of the robberies; (8) defendant fled from the police at the time of his arrest; (9) defendant made an inculpatory statement to the police at the time he was arrested; (10) defendant admitted to his girlfriend of doing a really bad thing; and (11) defendant's DNA matched that found on the North Face hat.

A-3885-22

B.

PCR Petition

In May 2010, defendant sought PCR alleging ineffective assistance of trial and appellate counsel and prosecutorial misconduct. As to the latter claim, defendant alleged he was denied a fair trial because the State failed to disclose the psychiatric history of his co-defendant, W.J. While the petition was pending, defendant filed a motion for a new trial based upon this "newly discovered" evidence of W.J.'s psychiatric records.

The PCR court denied the petition and new trial motion based on procedural and substantive grounds, without an evidentiary hearing. On appeal, we affirmed in part and reversed and remanded in part. Tanner II, (slip op. at 3).

C.

PCR Remand Evidentiary Hearings

Due to discovery, the recusals of two judges, and the impact of COVID-19, it took over five and a half years before the evidentiary hearings were completed and an order was entered.[6]

---

[6] The evidentiary hearings were conducted on January 29, 2018, January 30, 2018, February 16, 2018, March 5, 2018, May 14, 2018, December 18, 2019, February 25, 2020, February 27, 2020, March 3, 2020, March 4, 2020, and January 22, 2021.

In August 2017, prior to the first hearing date, defendant successfully moved for discovery of the prosecutor's file relating to W.J.'s resentencing, psychiatric evaluations, and discovery requests. Upon review of the discovery, defendant moved for a new trial based on newly discovered evidence. He contended that W.J. recanted his testimony inculpating defendant, that the prosecutor's scripting of witness testimony deprived defendant's trial counsel of effective cross-examination, and the prosecutor committed Brady violations by not disclosing W.J.'s pre-trial preparation statement that defendant did not wear or possess a hat with a North Face logo during the robberies.

The hearings produced the following relevant testimony.

W.J. 's Recantations & Mental Health

In February 2018, W.J., without legal representation, testified on behalf of the defense, recanting his 2006 trial testimony that he assisted defendant in committing the robberies. The PCR court halted the hearing because it felt compelled to appoint an attorney to represent W.J. The court later recused itself.

Following hearings in March 2018 and May 2018, the PCR court recused itself resulting in the delay of the next hearing until in December 2019, before a new PCR court. This time, W.J., represented by counsel, recanted his 2018 evidentiary hearing testimony by repeating his trial testimony that he drove

defendant to commit the robberies. The defense also presented the expert testimony of Kenneth J. Weiss, M.D., who did not examine W.J. but reviewed his psychiatric care clinical records reflecting that W.J. was diagnosed with unspecified psychosis and cannabis use, and prescribed an antipsychotic drug. Records prepared four months later showed that W.J.'s symptoms substantially resolved due to treatment.

Dr. Weiss opined that W.J. was psychotic at the time of his arrest and during his subsequent statements to the police. This made W.J. susceptible to suggestion and manipulation, lack the capacity to think critically, and have "difficulty sequencing things, understanding cause and effect, [and] understanding [himself] in relation to others." He explained that a psychotic person would be susceptible to leading questions through a process of internalization, where the questions "cue the individual as to what they're expected to say" and "then recite[] [it] . . . as if it were the person's own narrative." Based upon his review of the trial transcripts, Dr. Weiss could not confirm whether W.J. was psychotic during his 2006 trial testimony. He added that that a psychotic person can testify truthfully.

The State presented evidence that it was unaware of W.J.'s mental health issues when he testified against defendant. According to the Middlesex County

11

Assistant Prosecutor (trial AP) assigned to try the case six months before trial occurred, W.J.'s plea agreement had been reached prior to her involvement in the case. She explained that she was unaware of W.J.'s mental health history and did not "see any signs of . . . a mental health problem" at the time of trial.

File notes from an October 4, 2004 status conference by the initially assigned Middlesex County Assistant Prosecutor (initial AP), who retired about seven months before the original trial date, indicated that W.J.'s trial counsel's requests to have Peter Krakoff, PhD, issue a mental health evaluation report after examining W.J. was not authorized by the Public Defender's Office  The initial AP's "shorthand" notes from an October 4, 2004 status conference state:

> [W.J.'s counsel] says he has had [W.J.] examined by Dr. Krakoff who says [W.J.] is so slow prob[ably] didn't understand (Miranda, police, etc?) [and] will overborne. Report to follow. (That is crap — when read [statements], clear his [sic] is not stupid; [and] denied involvement in some incidents). [Therefore defendant] needs some more time for [report]. We then might need to hire own expert. [W.J.] also going to petition [Public Defender] for "ancillary services."

The initial AP testified that he never received a report evaluating W.J.'s mental capacity. He acknowledged his shorthand notes were his editorial thoughts about W.J.'s mental capacity. The trial AP stated she was unaware of the initial

12

AP's notes because she did not review the voluminous number of documents due to the short time she had to prepare for trial.

Defendant's trial counsel testified he was unaware of W.J.'s "diagnosis" as psychotic and believed the diagnosis could have been helpful for impeachment purposes to the defense depending upon the condition's specifics. Counsel implied he was not aware that W.J. had been hospitalized. But he admitted that he "did find out that [W.J.'s counsel] was putting in for an expert witness through the Public Defender's Office," but maintained that he did not know "why [W.J.'s counsel] was seeking that expert."[7]

While preparing for the evidentiary hearing, PCR counsel exchanged text messages with W.J.'s trial counsel who texted that W.J. wanted to accept a plea bargain, alleviating the need to spend money on an "evaluation." He also texted, "I'm prepared to say this secret deal interfered with the attorney[-]client relationship I had with my client, which precluded me from going further with

---

[7] In our decision ordering remand for an evidentiary hearing, we stated: "In addressing defendant's motion for a new trial based upon [W.J.'s] mental health issues, the PCR judge noted there was no evidence that the State was aware of the witness's psychiatric history. We agree with that assessment." Tanner II, (slip op. at 18). However, subsequent post-remand discovery revealing status conference transcripts from August 30, 2004, and October 4, 2004, show that all parties and counsel were aware of the suggestion that W.J. may have had some psychiatric condition requiring professional evaluation.

the doctor." However, W.J.'s counsel testified during the hearing that what he texted was wrong. Responding to PCR counsel's cross-examination, he stated:

> Well, I knew that the doctor was important and getting a report from the doctor was important to you. And I remember that we had extensive discussions about that and I disagreed with you. But I'm telling you what I wrote there is wrong. I made a mistake. The reason why I didn't go further with the doctor is [because] I didn't get the money.
>
> [(Emphasis added).]

He further testified that neither he nor Dr. Krakoff were able to confirm that W.J. suffered from any psychological deficits. In sum, W.J.'s counsel felt "the best I could [determine] is that he had a low IQ, wasn't very smart."

Finally, W.J.'s sister confirmed that defendant was their cousin and that they all grew up together. She stated that everyone in their family was aware that W.J. was hospitalized after his post-arrest suicide attempt, describing it as a "big thing."

W.J.'s Plea Agreement

Defendant's trial counsel testified he was advised that W.J.'s plea agreement negotiated by his trial counsel included a three-year prison sentence and that he was unaware of a more lenient sentence. Yet, as noted, W.J.'s trial counsel's text to PCR counsel referred to a "secret deal [that] interfered with the

14

attorney-client relationship . . . , which precluded [him] from going further with the doctor." W.J.'s trial counsel sought to mitigate the text, testifying that "after looking at the transcript from January 26, 2007, I have a stronger recollection . . . . I don't agree with that [text] now. I don't believe there was a secret deal." He further testified that W.J. "got the lowest possible sentence in January 2007," which was why he did not appear for W.J.'s resentencing six months later in July 2007, even though W.J.'s mother wanted W.J.'s trial counsel to file a motion for excessive sentence. He stated he could not negotiate a six-month prison term with five years' probation because that would be "an illegal sentence." W.J.'s trial counsel did not think that W.J. would be released prior to completing his three-year sentence, thinking at best, that after six months of incarceration, he could participate in a drug rehabilitation program under the Department of Correction's custody, which would receive credit towards his total three-year prison sentence.

The trial AP testified that the State recommended a four-year sentence with an eighty-five percent parole disqualifier provided W.J. testified truthfully at defendant's trial. She explained that the trial court reduced that sentence to three years with an eighty-five percent parole disqualifier under the same conditions. She claimed that, at resentencing, the State only consented to W.J.'s

15

entry into an in-patient rehabilitation program, but the trial court sua sponte ordered W.J. be released after only serving six months, placed in an in-patient rehabilitation program, and placed on five years' probation.

W.J.'s sister testified that it was her understanding that under the plea deal, he would get "six months in jail, and that after that he would go to a halfway house, and then he would have a few years of probation."

D.
PCR Court's Remand Decision

In an order, supported by a forty-six-page written decision, the PCR court denied defendant's petition and motion for new trial. In sum, the court held: (1) W.J.'s mental health issues were openly discussed during trial and plainly discoverable had defendant chosen to investigate them; (2) defendant presented insufficient evidence demonstrating a pre-arranged, more favorable plea agreement than that disclosed to the jury; (3) the cumulative impact of additional alleged trial errors or prosecutorial misconduct did not warrant a new trial; and (4) "[t]here was sufficient evidence, independent of [W.J.'s] testimony, to link . . . [d]efendant to the robberies." The court also noted there was "significant circumstantial evidence, independent of [W.J.'s] testimony, demonstrating the guilt of . . . [d]efendant." We address the court's reasoning in more detail below when analyzing defendant's contentions.

16

## II.

### Brady Violation Claims

Defendant argues that the PCR court erred in determining there was no merit to his Brady violation claims that the prosecutor: (1) did not disclose Dr. Krakoff's oral report that W.J.'s cognitive deficits prevented W.J. from understanding his Miranda rights; (2) withheld evidence regarding W.J.'s secret plea agreement allowing W.J. to be released after serving only six months; (3) concealed W.J.'s trial preparation statement that he did not see defendant wear a North Face ski mask during the robberies; and (4) suppressed W.J.'s statement that he could not recall his police confession and had to have his memory restructured two days before trial.

A Brady violation occurs when "(1) the evidence at issue [is] . . . favorable to the accused, either as exculpatory or impeachment evidence; (2) the State . . . suppressed the evidence, either purposely or inadvertently; and (3) the evidence [is] . . . material to the defendant's case." State v. Brown, 236 N.J. 497, 518 (2019). These three elements have been clarified or confirmed as follows.

Regarding the first element, the Brady rule also includes "[t]he obligation" to share "impeachment evidence within the prosecution's possession." State v.

17

Nash, 212 N.J. 518, 544 (2013) (citing Strickler v. Greene, 527 U.S. 263, 280 (1999)). As to the second element, the "disclosure rule applies only to information of which the prosecution is actually or constructively aware." State v. Nelson, 155 N.J. 487, 498 (1998); see also State v. Washington, 453 N.J. Super. 164, 184 (App. Div. 2018). And concerning the third element, the evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985); see also State v. Landano, 271 N.J. Super. 1, 36 (App. Div. 1994).

Our review of a PCR court's findings is under mixed standards.

> In reviewing a PCR court's factual findings based on live testimony, an appellate court applies a deferential standard; it "will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." [Nash, 212 N.J. at 540] (citing State v. Harris, 181 N.J. 391, 415 (2004), cert. denied, 545 U.S. 1145 (2005)). Indeed, "[a]n appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." Ibid. However, a "PCR court's interpretation of the law" is afforded no deference, and is "reviewed de novo." Id. at 540-41 (citing Harris, 181 N.J. at 415-16). "[F]or mixed questions of law and fact, [this Court] give[s] deference . . . to the supported factual findings of the trial court, but review[s] de novo

18

the . . . court's application of any legal rules to such factual findings."

[State v. Pierre, 223 N.J. 560, 576-77 (2015) (all alterations except the first in original).]

Thus, a PCR court's recitation of the legal standard governing a Brady claim is reviewed de novo, and "[i]f the correct standard is applied, the court's factual determination will be reversed only if clearly erroneous." State v. Marshall, 148 N.J. 89, 185 (1997).

Measured by these principles, we conclude that only defendant's claim regarding the non-disclosure of Dr. Krakoff's oral report constitutes a Brady violation warranting a new trial. Our analysis follows.

Dr. Krakoff's Oral Report

Considering the first and third Brady factors that evidence was favorable to defendant and material to his defense, defendant argues Dr. Krakoff's oral report, that W.J.'s mental limitations probably allowed the police to influence his statement about helping defendant commit the robberies, could have been used to impeach W.J. given his equivocal assertions of defendant's guilt. During his police interrogation, guilty plea, and at trial, W.J. said he drove defendant to commit the robberies. However, at his initial PCR evidentiary hearing W.J.

19

recanted that testimony. But over a year and a half later, he renewed his accusations that defendant committed the robberies.

The doctor's oral report was favorable to defendant, as the jury could have found that it established W.J.'s unreliability and thus rendered his testimony incredible. At trial, defendant challenged W.J.'s testimony, denying his accusations. The State's failure to disclose the oral report prevented defendant from independently acquiring the psychiatric report, subpoenaing Dr. Krakoff to testify, and effectively cross-examining W.J. Moreover, W.J.'s testimony was critical to demonstrate defendant's guilt since the balance of the State's evidence was wholly circumstantial. No victim identified defendant, and besides W.J.'s testimony, the State's case relied on circumstantial evidence. Video surveillance cameras recorded the robberies but did not clearly identify the assailant. And defendant's "inculpatory" statements to police (e.g., "if you knew what I did, you would run too") and to his girlfriend (e.g., he hurt someone) were vague and subject to interpretation. Impeaching W.J.'s testimony implicating defendant, would have had a significant impact on the State's proofs to establish defendant's guilt beyond a reasonable doubt. Consequently, knowledge of W.J.'s mental state at the time of his arrest and interrogation, was a crucial factor in defendant's defense.

A-3885-22

With respect to Brady's second factor regarding suppression of evidence, the initial AP's notes reveal the State's knowledge of Dr. Krakoff's oral report that W.J. suffered from mental limitations which probably caused the police to influence his confession that he helped defendant commit the robberies. The PCR court erred in finding that "the State was not in possession of a written report and thus was under no obligation to reveal evidence that it did not possess." The initial AP was obligated to inform defendant of the doctor's oral report given his knowledge of the report. The trial AP's lack of awareness of the report, and the fact that it was only oral, is irrelevant. See State v. Carter, 91 N.J. 86, 110 (1982) (recognizing that even though "a new trial [was] not warranted under either Brady or the newly discovered evidence test," the "oral report of the polygraph test should have been revealed to the defense"). The trial AP was in possession of the notes, giving her constructive notice of Dr. Krakoff's oral report. Her inadvertent failure to review the file containing her colleague's notes does not relieve her of her obligations under Brady.

Likewise, the PCR court's finding that "with reasonable diligence, [defendant's] attorney would be made aware of this information" is not a basis to reject defendant's Brady claim. This, as discussed later, is a factor in considering a motion for a new trial based on the discovery of new evidence,

21

but is not a factor under <u>Brady</u>.  <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), <u>holding modified by</u> <u>Bagley</u>, 473 U.S. at 682 (ruling that the State's duty to disclose <u>Brady</u> material is required even if the defendant does not request it). As our Supreme Court has emphasized:  "Simply put, '[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked.'"  <u>State v. Szemple</u>, 247 N.J. 82, 101 (2021) (alteration in original) (quoting <u>State v. Ways</u>, 180 N.J. 171, 192 (2004)). Thus, the PCR court's reliance on <u>Rule</u> 3:13-3, requiring disclosure of expert reports the State intends to call at trial is misplaced.  The State's discovery obligations under the rule are distinct from its constitutional due process obligation to disclose exculpatory or impeachment evidence under <u>Brady</u>.  <u>See</u> <u>Szemple</u>, 247 N.J. at 96; <u>Marshall</u>, 148 N.J. at 156.

<u>W.J.'s Plea Agreement</u>

We agree with defendant that if the State failed to disclose a secret plea agreement before W.J. testified against defendant—resulting in a resentencing of six months' time served and probation for testifying against defendant—the first and third <u>Brady</u> factors would be satisfied.  Defendant could have used the secret plea agreement to impeach the credibility of W.J.'s crucial testimony that defendant committed the robberies by arguing it was extremely lenient and

influenced W.J.'s testimony. Defendant, however, did not establish the second Brady factor, as he failed to show that the State suppressed evidence of a secret plea agreement, or to prove by a preponderance of evidence that an agreement existed.

In support of its finding that defendant "failed to present adequate evidence . . . of [a] plea agreement, [with] undisclosed more lenient terms," the PCR court explained: (1) the trial prosecutor "testified credibly . . . that her understanding of the plea agreement with [W.J.] was what was contained within the written plea agreement itself"; and (2) W.J.'s sister's testimony regarding a different understanding of the plea arrangement, was "of high risk that it may not be accurate" "due to her lack of experience and knowledge of the [c]riminal [j]ustice system." The PCR court noted W.J.'s trial counsel did not confirm defendant's theory of the secret deal, and because the trial court was involved in the plea negotiations, "if there was any pre-arranged agreement for a lesser sentence the trial [j]udge would have let that be known at [defendant's] trial and that never occurred." We see no reason to dispute the PCR's court's factual finding that the evidence at the hearing did not establish W.J. had a secret plea agreement prior to testifying at defendant's trial. The PCR court's factual determinations are not clearly erroneous. See Marshall, 148 N.J. at 185.

North Face Ski Mask

Defendant argues the PCR court erred in determining no <u>Brady</u> violation occurred when the State did not disclose W.J.'s trial preparation statement to the trial AP denying he saw defendant wearing a black ski mask with a North Face logo as opposed to a non-logo black hat to commit the robberies. Because this statement was contrary to W.J.'s post-arrest statement to the police, defendant asserts he could have used it to impeach W.J.'s testimony and thus warranting a new trial. We are unpersuaded.

The PCR court held:

> Based on this court's opportunity to evaluate the credibility of the testimony of [the trial AP] and [Detective Karleen] Duca, this court finds that [W.J.] did not make an inconsistent statement that was material to [defendant's] defense regarding his description of the hat that [defendant] wore during the robberies. It is clear from the evidence that [the arresting officer] was the key witness to identify the hat that was found near [defendant]. The DNA evidence confirmed that [defendant] wore that hat. Since the jury had the hat in evidence and was able to review the video showing [defendant] with a black hat on, it was certainly within the jury's ability to decide if the hat presented in evidence was the same hat worn by . . . defendant when he conducted the robberies.

We similarly assess defendant's contention that the State committed a Brady violation by not disclosing W.J.'s trial preparation statement that he did not see defendant wear a black North Face ski mask during the robberies.

While the State concedes the second Brady factor—that it suppressed W.J.'s trial preparation statement, which was favorable and material to the defense—defendant has not satisfied the first and third Brady factors. W.J. never told the police that defendant wore a black North Face ski mask.

W.J.'s 2003 post-arrest police interview revealed:

> SGT: [W.J.], do you recall [defendant] having a like a black ski mask when he did these robberies?
>
> [W.J.]: Yeah, a black hat, yeah. It could have been a mask. It was a mask.
>
> SGT: It was a black mask? And he wore that when he did the robberies, is that correct?
>
> [W.J.]: I guess. Yeah.
>
> SGT: You seen him with it on?
>
> [W.J.]: Yes sir. I didn't see him with it over his face.
>
> SGT: But you seen him holding it and you knew he had it?
>
> [W.J.]: Yeah. Well I never actually seen it. He rolled it up on his head. I didn't see . . .
>
> DET: He would get out of the car and . . .

[W.J.]: Actually . . . put the hat on.

DET: So when he got out of the car all the time, he had a hat that he put on. A black hat.

[W.J.]: Yes.

According to the State's trial preparation notes for defendant's 2006 trial, W.J. indicated that defendant was wearing a "stocking cap thing — black on head [—] never had an emblem or anything." When W.J. was shown defendant's hat (in either a photograph or sealed in an evidence bag) the State's trial preparation notes indicate that W.J. "doesn't think that [is] material — didn't see North Face." The detective testified that she did not write an investigative report on this issue because W.J.'s statement was consistent with his earlier statement to the police. The trial AP also testified that she believed W.J.'s responses were consistent considering that he initially indicated that the hat was rolled up on his head. At defendant's trial, as expected, W.J. testified that he saw defendant with a "black hat."

W.J.'s pretrial "no North Face logo" statement is not material to the defense given that trial testimony regarding a black North Face ski mask was established through the testimony of many of the robbery victims and surveillance video evidence. Moreover, the arresting officer testified that he saw defendant wearing a North Face knit cap just prior to the arrest, recovered

26

the ski mask from the location where defendant was arrested, and identified the item during the trial. And most significantly, the State presented forensic evidence that defendant's DNA was found on the North Face ski mask. Accordingly, we conclude there was no Brady violation in the State's non-disclosure of W.J.'s trial preparation statement.

W.J.'s Pretrial Inability to Recall His Confession Statement

Defendant argues the trial AP committed a Brady violation by not disclosing that, during trial preparation in February 2006, W.J. could not remember his confession to the police that he gave on the night of his arrest in October 2003. W.J.'s memory lapse was revealed by Detective Duca during her PCR hearing testimony stating that W.J. could not remember his police interrogation statements; he "wasn't comfortable discussing or having conversations"; and he needed "to be directed to what he had previously stated to police." Defendant stresses that "this . . . significant evidentiary development favor[ed] [his] defense since [W.J.] was the 'only eyewitness' and his lack of memory would mean the lack of any direct evidence against [him]." He further claims W.J.'s memory lapse is material to his defense because it could be used to exculpate him from the robberies and impeach W.J.'s trial testimony. We are unpersuaded.

In determining W.J.'s expressed memory lapse was neither exculpatory nor impeachment evidence, the PCR court reasoned:

> [W.J.'s] statements are in this [c]ourt's opinion foreseeable comments made by a witness being prepared to testify at trial for events that happened approximately two years prior. Also, there is a lack of evidence presented that the State did anything wrong or inappropriate in how it prepared [W.J.] to testify at trial. In this context, whatever statements [W.J.] made during trial prep were not material to the defense. Furthermore, based on this [c]ourt's ability to observe the credibility of [trial AP] and Duca, this [c]ourt cannot find that the State purposely or even inadvertently failed to reveal an inconsistent statement made by [W.J.] that was material to his defense. To this [c]ourt, there was no evidence for the State to reveal.

We agree for substantially similar reasons. Defendant provides no legal support for the conclusion that a witness's failure to remember details from a police interrogation given over two years earlier is exculpatory or impeachment information subject to a Brady disclosure. His reliance on a footnote in State v. Allen, where a trial court indicated that a Brady violation occurred when the prosecutor failed to disclose that a witness had "multiple [head] trauma and concussions" affecting her memory. 398 N.J. Super. 247, 254 n.5 (App. Div. 2008) (alteration in original). However, the Allen court did not review that Brady finding on appeal, nor is this court presented with a witness who

28

experienced head trauma. Allen is distinguishable, as W.J.'s trial preparation involved refreshing his recollection.

We do not conclude the State was obligated under Brady to inform the defense that a witness, especially where there is a natural reluctance to testify against a family member or purported accomplice, must be shown their confession statement because they cannot recall what they said. W.J. did not state at his trial preparation session that his confession of driving defendant to commit the robberies was untruthful; this would have been exculpatory information and used for impeachment purposes.

III.

Constitutional Due Process Claim

Defendant argues the trial AP's pretrial preparation of "each and every State witness" amounted to scripting their testimony, which violated his constitutional due process rights to a fair trial. He maintains the trial AP's technique of presenting each witness with a set of questions and answers (derived from their earlier police statements) "had the effect (or intent) of minimizing or eliminating the 'testimonial inconsistencies' that arise naturally in a trial, a fundamental element of cross-examination." Defendant argues this "interfer[ed] with his right of confrontation," depriving him of his right to a fair

29

trial. He specifically details the scripting of W.J. and defendant's girlfriend Kaihala Staten's testimony.

Because we addressed the contention regarding W.J. above, we need not repeat it. As to Staten, defendant emphasizes that her police statement provides that defendant called her sometime in late August or early September 2023 while she was with her brother and cousin at a pub and told her: that he was involved in a fight at a bus stop in North Brunswick; "he might have hurt them real bad, he don't know if [someone] was dead or not"; and "I don't know anything about a Krauszer[']s" convenience store being robbed. Defendant claims that the prosecutor's file reveals that the trial AP prepared a script omitting Staten's comments about the bus stop incident and lack of knowledge about a Krauszer's incident.

Staten's script, with the AP's suggested answers in parenthesis, relevantly, provides:

> Did the defendant ever tell you he had done something bad[?] (Yes)
>
> What did he say[?] (he called me one night and said he did something bad and needed to see me. He said he had hurt someone by accident, but didn't mean to do it. He hurt 2 guys.)
>
> Do you [know] about when he said this to you[?] (it was late August or early September)

The script also stated the time the call was received as being "no later than 12:30 [a.m.] or 1:00 [a.m.]" However, Staten's police statement does not indicate what time she received defendant's call. Defendant contends this scripting is the State's "misleading version of the phone call" "to falsely implicate [defendant] in the Krauszer's [robbery] shooting."

Although defendant does not detail the scripting of testimony other than W.J. and Staten, he asserts it applied to all State witnesses and tainted the trial.

In response to scripting W.J.'s testimony, the trial AP testified:

> My instructions that I give to all witnesses, and him included, was that it's not a script, here's the questions, the questions are to help me to make sure that I hit all the points that I need to hit. It's not a script. I follow you. You don't follow me. If there's anything with the questions that's different, than what is actually listed in parentheses in terms of like what I think your answer is going to be, let me know that and I will change that, but it's just to help me be prepared for trial. I also . . . told him . . . that if you don't understand a question, then just, you know, say you don't understand the question . . . . If you don't recall, then you don't recall. Do not guess and tell the truth. And with him I handed him his questions. We went over the questions.

She testified that she based her questions and answers from police reports, the witness's statement, and other information she had. In response to the PCR court's questioning, she testified that at the time she did not perceive her pretrial

31

preparation of witnesses "as impermissible coaching" but acknowledged she would no longer follow the same procedure based on the PCR proceedings.

The PCR court found that "there is a lack of evidence presented that the State did anything wrong or inappropriate in how it prepared [W.J.] to testify at trial." Regarding defendant's claim that Staten's testimony differed from her pretrial statement, the PCR court held the issue was procedurally barred under Rule 3:22-4(a) because it should have been raised on direct appeal. The court held the rule's exceptions to raise a PCR claim did not apply:

> The [d]efendant failed to demonstrate how if this issue is not considered at this time, it would cause a fundamental injustice to [him], especially since the issue raised is an ancillary issue as to the guilt of the [d]efendant. Lastly, it is clear this issue is not of constitutional import.

We substantially agree with the PCR court. Although the trial preparation technique used by the trial AP raises some concern, the record does not support defendant's assertion that the State's witnesses' testimony was scripted. A conviction obtained through false or misleading testimony is repugnant to the Constitution. Mooney v. Holohan, 294 U.S. 103, 112 (1935). However, we, like the PCR court, are satisfied with the trial AP's testimony that her witnesses' trial preparation questions and answers were based on police reports and witness statements and did not produce "'testimony that [was] substantially misleading'

. . . where the misleading nature of the testimony is 'obvious.'" United States v. Reyes-Romero, 959 F.3d 80, 103 (3d Cir. 2020) (quoting United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974)). The trial AP testified that she gave the witnesses her questions with anticipated responses and a copy of their statements with the admonition that testimony should be based on their truthful recollection. Thus, we see no basis to reverse defendant's conviction based on prosecutorial action that was "clearly and unmistakably improper" and "so egregious" in the context of the trial as a whole that it deprived the defendant of a fair trial. State v. Pressley, 232 N.J. 587, 593 (2018) (omitting internal citations); State v. McNeil-Thomas, 238 N.J. 256, 275 (2019).

IV.

New Trial Due to Newly Discovered Evidence

Defendant argues he is entitled to a new trial based on newly discovered evidence regarding W.J.'s mental health at the time of his arrest and shortly thereafter, because "a reasonable probability exists that the verdict would have been different had" the evidence been presented to the jury. Defendant stresses that because "[W.J.] was the State's 'only eyewitness,'" his suicide attempt while detained in the county jail and Dr. Weiss' PCR testimony would have undermined W.J.'s testimony and cast reasonable doubt on his guilt. Given our

33

conclusion that defendant is entitled to a new trial due to the State's <u>Brady</u> violation, we need not address this contention.

V.

To the extent we have not discussed them expressly, all other arguments raised by defendant lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(2).

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3885-22